**In the Matter of CENTURY CITY, INC., Debtor.**

**CONTINENTAL ILLINOIS NATIONAL BANK AND TRUST COMPANY OF CHICAGO, Great Pacific Century Corp., Century Associates, and One Century City Apartment Corp., Movants,**

v.

**CENTURY CITY, INC., Respondent.**

**Bankruptcy No. 79–03204.**

United States Bankruptcy Court, D. New Jersey.

Nov. 10, 1980.

Zazzali, Zazzali & Whipple by Lawrence A. Whipple, Jr., Newark, N. J., and Weil, Gotshal & Manges by Michael L. Cook, New York City, for Continental Illinois National Bank and Trust Company of Chicago.

Crummy, Del Deo, Dolan & Purcell by Michael R. Griffinger, Newark, N. J., and Skadden, Arps, Slate, Meagher & Flom by Dana H. Freyer, New York City, for Great Pacific Century Corp. and Century Associates.

Shanley & Fisher by Walter J. Fleischer, Jr., Newark, N. J., for One Century City Apartment Corp.

Ravin, Katchen & Greenberg by Jack M. Zackin, Newark, N. J., and Robert P. Herzog, New York City, for Century City, Inc.

## OPINION

D. JOSEPH DeVITO, Bankruptcy Judge.

The movants, Continental Illinois National Bank and Trust Company of Chicago, Great Pacific Century Corp., Century Associates and One Century City Apartment Corp. (defendants in the above captioned adversary proceeding), move pursuant to 11 U.S.C. § 1112[b] to dismiss the Chapter 11 petition and reorganization case commenced by Century City, Inc. on October 26, 1979, on the grounds that (a) the petition has not been filed in "good faith" and (b) debtor has no reasonable prospect of rehabilitation.

The following relevant factual background of the instant motion is essentially undisputed:

1. The debtor, Century City, Inc., wholly owned by Robert J. Slater, its president, was incorporated in the state of New Jersey on or before March 10, 1978, for the purpose of taking title to and developing two parcels of property known as the "Century City Project" located in Fort Lee, New Jersey.

2. For the development and construction of the "Century City Project", Century City, Inc. engaged Orange Gate Construction Co., Inc. and Slater Construction and Realty Company, a sole proprietorship, both of which are Slater-related entities.

3. In 1978 Robert Slater, on behalf of himself and various entities, including Century City, entered into a series of agreements with the movant, Continental Bank, the first being a construction loan agreement concerning the improvement of the Century City Project evidenced by two notes in the total sum of 24 million dollars, was executed on March 10, 1978. Thereafter, on December 18, 1978, a modification of that agreement increased the loan amount to $29,300,000. The final agreement, that of May 2, 1979, generally referred to as the Restated Agreement, superseded the earlier agreements and provided, *inter alia*, for a transfer of all of the debtor's tangible and intangible rights in the Century City Project to Great Pacific Century Corporation, a New Jersey corporation (Pacific), and Century Associates, a New Jersey limited partnership (Associates).

4. As partial consideration for the transfer of the two parcels, as aforesaid, the liabilities of the various Slater-related entities were assumed *in toto* by Great Pacific. By the terms of the May 2, 1979 Restated Agreement, Mr. Slater was divested of the two parcels and therewith ceased to exercise control over the partially constructed property. Thereafter Morse Diesel was engaged as general contractor in the place and stead of Orange Gate and Slater Construction and Realty, the two Slater-owned entities.

5. John E. Neal, vice-president of movant Continental Bank, testified to the mechanism employed to assure the liquidation of all Slater-related liabilities, as provided in paragraph 8 of the May 2, 1979 Restated Agreement. It appears that James Demetrakis, Esq., as disbursing agent for both Slater and Continental Bank, was charged with the responsibility of satisfying unpaid obligations contracted by Slater-related entities and Slater individually prior to May 2, 1979. Upon request from Demetrakis, the bank would advance funds in accordance with the May 2 Restated Agreement to Great Pacific who, in turn, would advance them to a trust account opened in the name of James Demetrakis for payment to credi-

tors. Approximately 3.75 million of such disbursements was made.

6. The Restated Agreement of May 2, 1979 provided that Great Pacific and Century Associates were to purchase claims against the debtor. The former, however, by letter of even date agreed not to enforce such acquired claims against the debtor. Demetrakis testified that Great Pacific and Century Associates "were purchasing assignments"; that they were, in fact, purchasing claims as opposed to securing releases, which claims, as noted above, they agreed not to enforce against the debtor.

7. On October 26, 1979 Century City, Inc. filed a Chapter 11 petition in the United States District Court for the Southern District of New York.

8. On October 29, 1979 Great Pacific, sponsor of Century City Towers, transferred the 31 story cooperative apartment building known as Century City Towers to Apartment Corporation. On the following day, October 30, 1979, Century commenced an adversary proceeding against the above captioned defendants, filing a complaint subsequently and finally amended on June 20, 1980, alleging, *inter alia*, that the May 2, 1979 Restated Agreement providing for the transfer of Century's real property to Pacific and Associates did not constitute the voluntary act of the plaintiff, but rather was the result of defendants' wrongful and coercive threats, acts, misrepresentations and undue influence, for which reason the transfer of the two parcels effected by that agreement should be set aside.

9. On August 29, 1980 the motion now considered was filed by the movants.

The defendants, alleging bad faith on the part of the debtor Century City, Inc. and its president and sole stockholder, Robert J. Slater, argue for dismissal of the debtor's Chapter 11 petition on two grounds: Firstly, they maintain that there is a virtual absence of creditors of Century City, Inc.; secondly, they deny categorically that there exists a reasonable expectation that Century City, Inc. can successfully effectuate a plan of reorganization, required in a Chapter 11 proceeding.

Century City, Inc., in its turn, has brought in question the authority of the Court to dismiss the instant Chapter 11 case, first, by challenging the standing of the defendants, refusing to consider them "parties in interest" pursuant to § 1109[b] of the Bankruptcy Code; further, by maintaining that the Court cannot *sua sponte* dismiss or convert a case under Chapter 11. Here again, plaintiff Century City relies on the language of § 1112[b] of the Code, requiring that such request be made by a "party in interest".[1]

Preliminarily, we note three possible bases of the Court's jurisdiction. First, 11 U.S.C. § 305[a][1] enables the Court, at any time, to dismiss a case under title 11 or suspend all proceedings in the case if the interests of creditors and the debtor would be better served by such dismissal or suspension. In direct contrast to common law, *see* 2 Collier on Bankruptcy § 305–.01–.02 (15th ed. 1980), § 305 recognizes that the Court may, under appropriate circumstances, order dismissal *sua sponte*, notwithstanding its jurisdiction was properly invoked in the first instance. *See* 2 Collier on Bankruptcy § 305.01–.02 (15th ed. 1980).

A second possible basis for jurisdiction is found in 11 U.S.C. § 1112[b], which delineates the standards governing dismissal of a case under Chapter 11. Under this provision, dismissal must be for cause, with application therefor limited to a party in interest. *In re Zip Print, supra.* "Section 1112[b] does not define what is meant by the term 'cause' although the subsection contains nine non-exclusive grounds which constitute 'cause'." 5 Collier on Bankruptcy § 1112.03, at 1112–12 (15th ed. 1980). A "party in interest" is defined in § 1109[b] of the Bankruptcy Code as "including the debtor, the trustee, a creditors' committee,

---

1. All counsel agree that pursuant to the standards set forth in 11 U.S.C. § 1112, dismissal or conversion of reorganization proceedings can be permitted only upon request of a party in interest and only following appropriate notice and opportunity to be heard. See e. g. *In re Zip Print*, 4 B.R. 676 (Bkrtcy.N.D.Ga.1980).

an equity security holders' committee, a creditor, an equity security holder, or any indenture trustee."[2]

■ Third, under its inherent power the Court may act *sua sponte* to dismiss, independently of the grounds specified in either § 305[a] or § 1112[b] of the Code. *See Banque de Financement v. First Nat'l Bank of Boston*, 568 F.2d 911, 916 n. 8 (2d Cir. 1977); *In re Ettinger*, 76 F.2d 741 (2d Cir. 1935); *In re Pioneer Warehouse Corp.*, 2 B.R. 1, 9 (Bkrtcy.E.D.N.Y.1979). The power of the Court to dismiss a case when its jurisdiction has been improperly invoked is inherent in the bankruptcy court as a court of equity, guided by equitable doctrines and principles; *SEC v. United States Realty & Improvement Co.*, 310 U.S. 434, 435, 60 S.Ct. 1044, 1046, 84 L.Ed. 1293 (1941). *See also Pepper v. Litton*, 308 U.S. 295, 304, 60 S.Ct. 238, 244, 84 L.Ed. 281 (1939). "There is an overriding consideration that equitable principles govern the exercise of bankruptcy jurisdiction;" *Bank of Marin v. England*, 385 U.S. 99, 103, 87 S.Ct. 274, 277, 17 L.Ed.2d 197 (1965). *See In re St. Matthew Lutheran Church*, 6 Bankr.Ct.Dec. 578 (Bkrtcy.C.D.Cal.1980), wherein the court expressly based its decision to dismiss a Chapter 11 case, not on 11 U.S.C. § 305[a], but rather on its inherent power to dismiss a case which imposed upon its jurisdiction.

In further support of the Court's power to act *sua sponte* to dismiss, we note that unlike Section 146 of Chapter X, the corporate reorganization chapter of the former Bankruptcy Act, neither Chapter XI and Chapter XII of that Act, nor Chapter 11 of the Bankruptcy Code contains a specific requirement that the relief petition be filed in "good faith". Nevertheless, employing their equity powers, courts have considered the allegation of bad-faith filing of a Chapter XI and Chapter XII petition. *See In re Mallard Assocs.*, 463 F.Supp. 1259 (S.D.N.Y. 1979), *In re Runnymede Corp.*, No. B–76–811 (D.N.J. August 6, 1976). *Also see* Norton, Real Property Arrangements, Part 14, Section 1.

Plaintiff Century City's challenge to movants' standing turns on whether the movants may properly invoke § 1112[b] of the Code as parties in interest and, hence, raise objections relative to Century City, Inc.'s alleged bad faith in filing a Chapter 11 proceeding. The movants, in turn, assert that under the virtually all-encompassing Code definitions of "creditor", 11 U.S.C. § 101[9], and "claim", 11 U.S.C. § 101[4], they are indeed creditors holding contingent claims against Century City, Inc., dependent upon the outcome of the adversary proceeding. Thus, the movants maintain, they are parties in interest sufficient to sustain their standing to move for dismissal under § 1112[b].

■ The Court seriously questions whether either § 305 or § 1112 is applicable in the present situation. Abstention under § 305[a][1] is permitted only if the interests of creditors and the debtor would be better served by dismissal of a case or suspension of all proceedings. A reading of the following legislative history is instructive:

> This section [305] recognizes that there are cases in which it would be appropriate for the court to decline jurisdiction. Abstention under this section, however, is of jurisdiction over the entire case.... Thus, the court is permitted, if the interests of creditors and the debtor would be better served by dismissal of the case or suspension of all proceedings in the case, to so order. The court may dismiss or suspend under the first paragraph, for example, if an arrangement is being worked out by creditors and the debtor out of court, there is no prejudice to the rights of creditors in that arrangement, and an involuntary case has been commenced by a few recalcitrant creditors to provide a basis for future threats to extract full payment. The less expensive out-of-court workout may better serve the interests in the case. Likewise, if there is pending a foreign proceeding

**2.** The list is not necessarily exhaustive since, as these terms are used in the Code, "includes" and "including" are not limiting. 11 U.S.C. § 102[3].

concerning the debtor and the factors specified in proposed 11 U.S.C. 304[c] warrant dismissal or suspension, the court may so act.

H.R.Rep.No.95–595, 95th Cong., 1st Sess. 325 (1977); S.Rep.No.95–989, 95th Cong., 2d Sess. 35 (1978), U.S.Code Cong. & Admin. News 1978, pp. 5787, 6281. See also Gaffney, *Bankruptcy Petitions Filed in Bad Faith*, 12 U.C.C.L.J. 205, 238–39 (1980).

Similarly, § 1112[b] enumerates nine causes that may trigger conversion or dismissal of a Chapter 11 case. Though said causes are non-exclusive, all, however, are predicated on the existence of creditors *and* an estate, with *none going to the threshold* question of the existence *vel non* of creditors.

■ In accordance with prevailing decisional law, *supra*, together with express statutory authorization, Bankruptcy Reform Act § 105[a][3], 11 U.S.C. § 105[a]; Bankruptcy Reform Act § 1481, 28 U.S.C. § 1481 (Supp.1980), *as applied by* Bankruptcy Reform Act, Pub.L. No. 95–598, § 405[a][1], 92 Stat. 2549, with respect to the instant proceeding, this Court reaffirms its inherent power to dismiss a Chapter 11 case when its jurisdiction has been improperly invoked.

Movants, Great Pacific Century Corporation, et al., allege that Century City's bad faith in filing its petition for reorganization is twofold: first, the virtual absence of creditors of Century City, Inc., reflected in a sham indebtedness; and second, the infeasibility of effectuating a reorganization plan. In its initial response the debtor contends that, since it was the result of movants' motion that the reorganization proceedings were transferred for improper venue from New York to New Jersey, movants are now estopped from imputing to Century bad faith in the filing of its Chapter 11 proceeding. Movants submit that Century's false statements concerning its principal place of business is further evidence of the debtor's bad faith, which, of course, goes to the question of the debtor's alleged improper motives underlying the filing of the Chapter 11 petition.

■ This Court holds that the movants are not barred by the doctrine of *res judicata* from raising the question of improper venue and alleged attendant bad faith. *Res judicata*, like collateral estoppel, is aimed at judicial finality and, like collateral estoppel, applies only to a final order or judgment on the merits. *See* 1B Moore's Federal Practice §§ 0.404 and 0.410 (2d ed. 1974). A motion pursuant to Bankruptcy Rule 116[b][2], like a venue transfer under 28 U.S.C. § 1404[a], is not a final judgment. *Pastewka v. Texaco*, 565 F.2d 851, 853 (3d Cir. 1977). In any event, since the claim or demand in the instant proceeding differs from that in the prior New York action, in the strict sense of the terms, the principles of collateral estoppel, rather than those of *res judicata*, apply. As a result, the moving parties are not, as to the different cause of action, foreclosed from raising and litigating matters that were not adjudged, even though they may have been litigated in the earlier action. *See* Moore's Federal Practice, supra, §§ 0.405 and 0.410. *See also Commissioner of Internal Revenue v. Sunnen*, 333 U.S. 591, 597–98, 68 S.Ct. 715, 719, 92 L.Ed. 898 (1948); *Haize v. Hanover Ins. Co.*, 536 F.2d 576, 579 (3d Cir. 1976); Restatement of the Law of Judgments §§ 68–70 (1942).

■ It is well settled that under *Marine Harbor Properties v. Manufacturer's Trust Co.*, 317 U.S. 78, 83–85, 63 S.Ct. 93, 96–97, 87 L.Ed. 64 (1942) and its abundant progeny, the burden of proving that a petition was brought in good faith is on the petitioning debtor. However, *Marine Harbor* and its progeny are all Chapter X cases, with respect to which, as noted *supra*, a good-faith requirement is imposed by statute. Where, as in the case *sub judice*, there is no such statutory requirement, different rules apply. *See Manufacturers Credit Corp. v. SEC*, 395 F.2d 833, 847 (3d Cir. 1968). *Young v. Handwork*, 179 F.2d 70, 76 (7th Cir. 1949), *cert. denied*, 339 U.S. 949, 70 S.Ct. 804, 94 L.Ed. 1363 (1950), *reh. denied*, 339 U.S. 991, 70 S.Ct. 1021, 94 L.Ed. 1392 (1950) ("[W]hile good faith is presumed in

many situations .... the law does not indulge in such tolerance where it is sought to seek advantage or protection of a statute which contains as its essential ingredient the element of good faith."); *In re Meister Blau, Inc.,* 335 F.Supp. 515, 517 & n. 4 (N.D.Ill.1972) ("[S]ome evidence must affirmatively show that further proceedings under Chapter XI will be inappropriate.") Moreover, both Bankruptcy Reform Act § 1111[a], 11 U.S.C. § 1111[a], and interim Bankruptcy Rule 3001 provide that inclusion of a claim or interest on the debtor's schedules is deemed *prima facie* evidence of its validity and amount provided that such scheduled claim or interest is neither disputed, nor contingent, nor unliquidated.[3]

The contention of the movants, Great Pacific, et al., that Century has virtually no bona-fide creditors is bolstered by the elaborate analysis of Century City, Inc.'s purported creditors, assembled by the movants in Appendices I–IV, submitted with their brief.[4] On the basis of that analysis, it cannot be gainsaid that the movants' contention is supported by substantial evidence on the record. A *prima facie* case having been successfully made by the movants, the burden of proof shifts to the debtor Century City, Inc.

█ "Bankruptcy proceedings are proceedings *in rem*, having for their object (1) the securing of possession of the insolvent's assets and the equitable division thereof among creditors; and (2) the liberation of worthy debtors from the burden of unpaid debts;" *Dranow v. United States,* 307 F.2d 545, 557 (8th Cir. 1962). In the absence of true debt (defined in 11 U.S.C. § 101[11] as "liability on a claim") and true creditors,

Century City, Inc. would, of course, be unable to initiate rehabilitation proceedings under Chapter 11. Century City's Chapter 11 is, of course, a voluntary bankruptcy proceeding. Pursuant to 11 U.S.C. § 301, a Chapter 11 may be commenced by voluntary petition of the debtor. The commencement of a Chapter 11 case by filing a petition under such chapter of Title 11, U.S.C., constitutes an "order for relief". Under 11 U.S.C. § 109, which sets forth eligibility requirements to be a debtor under each chapter, excepting stockbrokers, commodity brokers and railroads, any person eligible to file a voluntary petition under Chapter 7 of the Code is eligible to file a petition under Chapter 11. Though a debtor need not be insolvent to seek any form of voluntary relief under the Code, it is judicially recognized that a major objective of the reorganization provisions of the Code is "to offer a viable mechanism for the rehabilitation of a financially troubled business." *See* Bisbee, *Business Reorganization Practice Under the Bankruptcy Reform Act of 1978,* 28 Emory L.J. 709, 757 (1980). As stated in *In re Penn Central Transportation Co.,* 467 F.2d 100, 102 (3d Cir. 1972): "It is the basic purpose and scheme of the corporate reorganization provisions of the Bankruptcy Act to enable a financially embarrassed debtor to postpone payment of accumulated financial obligations until there can be formulated and approved a fair and feasible plan for satisfying those obligations without liquidating the burdened enterprise." Integral to this purpose is the discharge in bankruptcy to the debtor following confirmation of the plan, provided for in 11 U.S.C. § 1141[c] and [d][1]. Suffice it to say that, absent

---

**3.** "Chapter 11 adopts the former Chapters X and XII practice, developed by the rules, of making it unnecessary to file proofs of claim and stock interests. Section 1111[a] deems filed a claim or interest that is scheduled and is not shown as disputed, contingent, or unliquidated.... However, a creditor holding a claim that is scheduled as disputed, contingent, or unliquidated does have to file a proof of claim." King, *Chapter 11 of the 1978 Bankruptcy Code,* 53 Am.Bankr.L.J. 107, 120–21 (1979). Of course, as regards the instant proceeding, no proof of claim has been filed by any creditor at

all listed on either the Statement of Affairs or the Petition, not even by those purported creditors of Century City, Inc. holding claims that were scheduled as disputed, contingent, or unliquidated. An examination of the claim docket reveals that but one claim, that of Public Service Electric & Gas Co. in the amount of $4,593.95, remains as a filed claim.

**4.** A substantial portion of the Appendices, consisting of innumerable instruments, documents, depositions, etc., were in fact marked in evidence.

real debt and real creditors on the part of the debtor, the basic purpose of a Chapter 11 will be thwarted. Under such circumstances, for the Court to retain jurisdiction would be, in effect, to countenance an abuse of process since it is unable to provide the intended relief. *See Security Nat'l Bank v. Turner*, 608 F.2d 1358, 1361 (10th Cir. 1979).[5]

The oral testimony of subpoenaed non-Slater related purported creditors of Century City, Inc. demonstrated that not everyone who worked on the Century City Project was, *ipso facto*, a creditor of Century City, Inc. Indeed, most, if not all, of the subpoenaed purported creditors testified that they did not know with any degree of certitude who owed them the money, but that they looked to anyone, including Century City, Inc., for payment of the asserted debts. This is true even of the architect, Henry J. Stojowski, who testified that he looked, in part, to Century for payment of unpaid obligations. Thus, it was adduced in oral testimony that payment was owed by Slater or "Slater or one of his entities" (William Burger); or "whoever owns that property owes me whatever fee I did on behalf of that property" (Lawrence Stern); or "I looked or worked with Mr. Slater. He represented whoever is involved in this project.... I looked to Mr. Slater and I look to whoever is involved" (Anne Zuckerberg); "anyone involved on the project and the property" (Henry J. Stojowski); "I was a subcontractor to Orange Gate Construction and no one else" (John Paladino). Also quite telling in this connection is the paucity (where there is not an utter lack) of hard documentary evidence—invoices, agreements, correspondence, etc.—highlighted by the testimony of the witnesses, documenting any alleged debts owed its creditors by Century City, Inc.

In their turn, the movants Great Pacific, et al., subpoenaed five purported creditors of Century City, Inc., four of whom testified (the fifth failed to appear).

Edith Restaino, office manager and head bookkeeper at Wilkinson and Co., testified that a) Wilkinson entered into a relationship with Slater Construction and Orange Gate Construction as a subcontractor on the Century City Project; b) to her knowledge, Wilkinson did not enter into any contract with Century City, Inc.; c) the accounts receivable ledger card was maintained in the name of Slater Construction and Orange Gate Construction; d) Wilkinson was paid in full as of May 31, 1979, said payment being made by Morse Diesel, Inc.; and e) there are no outstanding debts owed Wilkinson by Slater or any Salter-related entities with respect to the Century City Project.

Frederick Porcello, a civil engineer and vice-president of Testwell Laboratories, Inc., testified that Testwell Laboratories was engaged by Slater Construction and Realty Co. to perform concrete testing on the Century City Project in Fort Lee, New Jersey. While firm in declaring that Testwell did not enter into any agreement with Century City, Inc., furnish any direct services to Century City, Inc., invoice Century City, Inc. (all invoices were directed to Slater), have an accounts receivable ledger card for Century City, Inc., or consider Century City, Inc. to owe Testwell Laboratories any unpaid obligations, Porcello, like many other creditor witnesses, was frank in his avowal, "We are looking to anyone who will pay." But later, upon cross-examination, he made it plain that the claim asserted by Testwell against Slater, d/b/a Slater Construction and Realty Company, has nothing to do with the owner of the Project. "My contract was with Orange Gate or Slater. It had been verified by both firms."

Daniel Parker, vice-president and part owner of Weber Engineering Company, Inc., testified that a) Weber was engaged to perform work on the Century City Project pursuant to an agreement dated October 23, 1978 between Orange Gate and Weber; b) sometime or times subsequent to May 2,

---

5. *See* Senate Rep.No.95–989, 95th Cong., 1st Sess. 9, *reprinted* in [1978] U.S.Code Cong. & Ad.News, pp. 5787, 5795.

1979, per agreements dated September 17, 1979 and October 25, 1979, Morse Diesel replaced Orange Gate to complete the unfinished work under the agreement dated October 23, 1978; c) there were no other agreements between Slater or any Slater-related entity and Weber; d) all services contracted by Weber were rendered to Orange Gate and, later, in accordance with the aforesaid agreements, Morse Diesel, to which entities the Project-related invoices were respectively addressed; and e) there are no unpaid obligations owed Weber by Century City, Inc.

The testimony of J. Michael Kimble of Foley Machinery Company, located in Piscataway, New Jersey, was substantially of the same effect: All business relations conducted by Foley vis-a-vis the Century City Project were the Orange Gate Construction, none with Century City, Inc. Ultimately, an action was commenced by Foley Machinery, naming Orange Gate Construction, not Century City, Inc., as defendant on account of Orange Gate's unpaid liabilities. Mr. Kimble explicitly stated that Century City, Inc. is not now, and never was, justly indebted to Foley.

John Neal of Continental Bank, contacted by Mr. James Demetrakis in connection with the latter's requests for payments to be made from the $3.8 million trust account, testified that approximately $50,000.00 of the $3.8 million fund were not paid to creditors, that the reason some creditors were not paid is that neither Slater nor Demetrakis requested the bank to pay them. It was Neal's testimony that though the bank, Great Pacific, Demetrakis and Slater "worked very closely on paying these bills" during the period May to October preceding the filing of the petition for reorganization, "there was $50,000.00 remaining to be funded [i. e., charged to Great Pacific and disbursed by James Demetrakis], which we would have funded if requested at subsequent dates." Clearly, it would be an unwarranted assumption for this Court to suppose, in the face of so much contrary evidence, that these unpaid creditors were *eo ipso* creditors of Century City, Inc.

Though the good-faith filing of its Chapter 11 petition has been brought into question, the bona fides of Century City's corporate status has not. As a corporate entity, Century City is deemed to have a separate and distinct existence, such that its debts and other contractual obligations must be negotiated at arm's length. *See e. g. Pepper v. Litton*, 308 U.S. 295, 306–07, 60 S.Ct. 238, 245, 84 L.Ed. 281 (1939). It does not suffice to show that Century has creditors merely because a debt or debts were incurred as a result of work on the Century City Project, nor is it enough that a debt or debts may be owed by or payment in some cases sought from Slater or a Slater-related entity, such as Century City.

Finally, we turn to the timing of the Chapter 11 filing, which this Court considers of significant relevance when considering the issue of bad faith. It appears that during the six months preceding the filing of the petition, Century made full use of its benefits under the Restated Agreement, apparently without challenging the validity of that agreement. Further, that it was only after its efforts to delay the transfer of the cooperative apartment building that Century filed its Chapter 11 petition, followed immediately (on October 30, 1979) by the filing of its complaint raising the issues of fraud, duress and coercion with respect to the execution of the agreement, all of which, together with the absence of tangible assets and creditors, casts serious doubt upon the motive underlying the filing. Viewed in their totality, all of the foregoing lead this Court to conclude that Century's true motive was not to rehabilitate a financially distressed corporate debtor, but rather to utilize such proceeding as a vehicle to recapture the parcels of property transferred pursuant to the Restated Agreement, all of which constitutes a misuse of the Bankruptcy Code and the processes of this Court.

As a result of the above, this Court deems it unnecessary to reach the issue of infeasibility of effectuating a plan as a subset of bad faith. Suffice it to say that even Century's most optimistic projections are, of

necessity, premised upon recapture of the transferred parcels, an event so speculative as to defy evaluation. It would appear that the best interests of the debtor would be served by pursuing the recapture of the property in a state or other federal forum.

By reason of all of the foregoing, the motion to dismiss the Chapter 11 petition is granted.