In re I-5 INVESTORS, INC., Debtor.

COLUMBIA MORTGAGE CO.,
INC., Plaintiff,

v.

I-5 INVESTORS, INC., Defendant and
Third Party Plaintiff,

v.

UNION LABOR LIFE INS. CO., Third
Party Defendant.

Bankruptcy No. 682–07009.
Adv. No. 682–7047.

United States Bankruptcy Court,
D. Oregon.

April 16, 1982.

Carlton Warren, Portland, Or., for plaintiff.

Lawrence Cooley, Eugene, Or., for defendant and third party plaintiff.

## MEMORANDUM OPINION

C.E. LUCKEY, Bankruptcy Judge.

Before the Court are an adversary proceeding commenced by Columbia Mortgage Co., Inc., (Columbia), seeking relief from the automatic stay alleging also that the Chapter 11 case should be dismissed as a filing not in good faith, and motions to dismiss filed in the Chapter 11 case by lien claimants Builder's Electric, Inc., J. I. Johnston Construction Co., Chase Company Mechanical Contractors, Inc., and C. Anderson Griffith as a partner in Springfield Investments, by virtue of asserted ownership of real property claimed by the debtor, who had joined in the motion of Builder's Electric, Inc., seeking dismissal.

The evidence and arguments presented to the Court apply to both the complaint seeking relief from the automatic stay and the motions to dismiss and this Opinion will therefore address the issues raised by each and provide basis for disposition thereof.

Before 1979, A.W. McFarland obtained an option on approximately 19 acres of undeveloped commercial real estate in Springfield, Oregon, bordered by Interstate Freeway 5 which in general serves as a dividing line between the cities of Eugene and Springfield. McFarland was the president and principal of Allied Commercial Realty Co., and Allied Real Estate Securities, Inc. In September, 1979, Allied Real Estate Securities, Inc., took conveyance of the property from the former owner, James McClory.

In his ventures, McFarland joined with one Donald E. Cooper who was also president of Chandalar Realty, Inc. In concert, by formation of many limited partnerships, Cooper and McFarland and their agents induced investment in their real estate development enterprises and those of other corporations in numerous cities and locations throughout Oregon. Approximately a year before the filing of this Chapter 11 proceeding, Cooper and McFarland had an accounting of their individual and corporate interests, resulting in Cooper receiving for his interest a grant from the McFarland interests relating to property in or near Tigard, Oregon, and McFarland and his interests received a grant from Cooper of Cooper's and Chandalar's interests in the remaining 6.1 acres of the property which had been acquired and remained from the original 19 acre option, and has been and will be referred to in these proceedings as the Gateway Loop properties, the subject of this case.

To finance the purchase of the Gateway Loop property, McFarland had generally operated as Allied Commercial Realty Co., and had formed limited partnerships, with the McFarland organizations as general partner. Involved in the scheme were "lease backs", and options back to McFarland or his organizations. In addition, money was obtained from "investors" who were offered undivided interests in the land, or parcels thereof being developed, and undivided interests in the buildings being or to be constructed, without formalized limited partnerships with the usual provisions providing for McFarland's remaining in operational control, and a representation that the offered interests in tangible property would not be recorded until permanent financing was obtained.

It was acknowledged that the people who were led to believe they were acquiring percentage interests in land or buildings now have no recorded interest therein. They have what a witness, Michael J. Safley, whose connection will hereafter appear, very knowledgeable in real estate transactions and ownership interests, has described as "invisible interests" and "thin air".

On the Gateway Loop property, McFarland, as Allied Commercial Realty Co., obtained loans from mortgage companies, involving also banks and insurance companies generally on floating interest terms involving an interest rate fixed above the prime rate charged by one of Oregon's large banking institutions. Several buildings have been built on the property, including a restaurant, a building leased as a furniture store, a vacant office building, and a building occupied by what is known as 3–M and a building partially leased by Lane County Labor Temple Benevolent Association, Inc., referred to as the "Union Building". The latter building and land alloted to it are subject to a trust deed to Columbia, which instituted a non-judicial foreclosure and on September 1, 1982, gave notice of sale for January 14, 1982.

On January 7, 1982, the present debtor, I–5 Investors, Inc., (I–5), an Oregon corporation chartered December 22, 1981, filed this Chapter 11 proceeding as grantee by bargain and sale deed of the land from the McFarland interests which was also signed by Cooper, with the acknowledged purpose of staying the foreclosure sale.

As above related, Columbia filed a proceeding seeking modification of the automatic stay to enable sale, and seeking dismissal of the proceedings on the ground that the creation of I–5 for the purpose of instituting the Chapter 11 proceedings under the facts constitute a "bad faith" filing. Lien claimants against the same building for labor and materials also have filed motions to dismiss the proceedings.

Preliminary to the transfer to the debtor, a long scenario led to the present posture of the case.

Michael J. Safley is an active real estate broker and investor in the Eugene-Springfield area who has clients interested in making realty oriented investments. He testified that he was contacted in late November, 1981 by a client who asked his advice about a potential investment in the Gateway Loop property, and that he made a preliminary investigation which led him to advise his client that there were too many problems to justify investment by a "passive investor". In December, 1981, Safley shortly thereafter considered trying to acquire the "thin air" or "invisible" interests of those limited partners or others styled "investors" who had advanced funds to McFarland for the project. Safley in connection with such activity contacted the Oregon Corporation Commissioner to explore some form of snydication of the outstanding interests in the property. The Corporation Commissioner had been receiving complaints from persons who had not been receiving contemplated return from their investments, and foresaw substantial burden and problems of snydication, alluding to the fact that some of the investors resided outside the State of Oregon. McFarland's attorney had suggested the consideration of McFarland's corporations instituting a Chapter 11 proceeding, but it was not proceeding because of McFarland's financial inability to generate the funds necessary for the filing. Out of the conferences between Safley and the Corporation Commissioner and his staff it was concluded that if the Gateway Loop interests could be acquired by a corporation to be formed by Safley, and the problems and assets of that property isolated from the problems, assets and liabilities of McFarland's and his organizations' other interests, Safley might proceed. On December 17, 1981, the Corporation Commissioner's memorandum from his staff member, Tom Higashi, reflects a telephone conversation with Stephen Philpott, who was acting as Safley's attorney, reflecting that Safley had hired another attorney to file a Chapter 11 bankruptcy proceeding, Owen McCullen, (misnamed as McCullum in the memo) in the event that McFarland and Allied would deed the prop-

erties. The memo reflected concern over whether the procedure would be proper without Allied going into Chapter 11—"can assets and investors be isolated this way— he (McCullen) said 'yes' ". McFarland's attorney was contacted and thereafter a transfer occurred by bargain and sale deed which contained among its provisions the following (Exhibit 14):

"STATUTORY BARGAIN AND SALE DEED AND ASSIGNMENT

"ALLIED REAL ESTATE SECURITIES, INC., an Oregon corporation, ALLIED COMMERCIAL REALTY CO., an Oregon corporation, and A.W. McFARLAND an individual and DONALD E. COOPER, an individual (herein collectively referred to as Grantor), convey to I–5 INVESTORS, INC., an Oregon Corporation, Grantee, the following described real property:

"See Exhibit 'A' attached hereto and by this reference incorporated herein.

"The true consideration for this conveyance is $-0-, together with other promises given by Grantee.

"Grantee acknowledges that various persons have claims against Grantors which may or may not constitute unrecorded interests in the described property. Nothing contained herein shall be deemed to classify or quantify any of such claims.

"Grantee does not hereby assume or agree to pay any of said claims or purchase any of said interests. Neither does Grantee assume or agree to pay any liens, encumbrances or other obligations secured by the described property or any portion thereof, nor any claims, suits, actions or liabilities of any kind whatsoever arising from Grantor's activities with respect to the described property.

"Grantors hereby assign to Grantee any and all claims, rights, remedies and causes of suit or action held by the Grantors, and each of them, against any one or more persons or entities arising from the mortgage, encumbrance, transfer, sale, conveyance and/or lease of any interest in all or any portion of the described property by any one or more of the Grantors, including without limitation, any claims, rights and/or remedies held by Allied Real Estate Securities, Inc., against First Northwest Mortgage Co., an Oregon corporation, and/or Springfield Investments, a General Partnership, and/or any of their successors in interest relating in whole or in part to any portion of the described real property.

"Grantors, and each of them, hereby covenant and warrant to Grantee that no one or more of the Grantors have waived or released any such claims, suits or actions against First Northwest Mortgage Co., Springfield Investment, or any of said entities' successors in interest with regard to any matter relating in whole or in part to the described real property.

"Donald E. Cooper hereby assigns, transfers, conveys and sets over to Grantee all of said Grantor's right, title and interest in and to the described property and the proceeds received therefrom held by virtue of that certain Management Agreement dated July 31, 1981 between McFarland, Allied Commercial Realty Co. and Cooper.

"Grantee does not hereby intend to waive or release, on its own behalf or on behalf of any other person or entity, any claim, right, action or remedy of any kind whatsoever which now exists or which may hereafter arise against Grantor or any one of them.

"As used herein, the singular includes the plural and the plural the singular as the context requires. In the event any suit or action or other legal proceeding is brought to interpret or enforce the terms of this instrument, the prevailing party shall recover from the other party, in addition to costs and disbursements as allowed by law, the prevailing party's reasonable attorney fees as set by the court in such suit, action or other legal proceeding, and any appeal therefrom.

"DATED this 22nd day of December, 1981."

(Description omitted)

This was followed a week later, December 29, 1981, by a conveyance of personal

property, all relating to the property described in the deed.

Clothed with what was a designed intention to isolate the multifarious interests in the numerous entities controlled by Allied and McFarland from the Gateway Loop property, a Chapter 11 petition was filed on January 7, 1981, by I–5.

At a hearing to consider, pursuant to U.S. Bankruptcy Court for the District of Oregon Rule 17, whether or not pursuant to Bankruptcy Rule 11–20(d), indemnity should be required to indemnify or protect the estate against loss or dimunition of assets in the event of ultimate liquidation as a consideration of the debtor's continued operation, a bond was ordered posted because the only assets of the debtor, and only capitalization was the advance of attorneys fees and costs incidental to the filing, apart from assets obtained from the property of the grantors. The bond was fixed as $25,-000 and was never furnished in the form of an indemnity bond. At the indemnity hearing on January 15, 1982, those in attendance included numerous of the "investors", and attorneys for Columbia, lien holders, and others in addition to A.W. McFarland and Michael Safley, who was accompanied by his attorney Owen McCullen. At the hearing the legally obscure status of the "investors" was developed by examination of McFarland, as was the contention that the proper debtor to be before the Court was not I–5, as a shell grantee, but the Allied Commercial Realty Co., and McFarland, who had interests other than the Gateway Loop property. Schedules were not yet filed.

On February 8, 1982, Columbia filed its complaint to modify stay and dismiss proceedings. Under the time constraints of Section 362(e) of the Bankruptcy Code, pretrial conference was held pursuant to notice on February 22, 1982, on the complaint. It appeared that trial of the issues was indicated, and trial date within the 30-day requirement of § 362(e) discussed. Mr. McCullen remonstrated that a military reserve commitment would cause him to be absent for three weeks and Mr. Warren,

attorney for Columbia, agreed to waive the 30-day provision with an agreed trial to commence March 31, 1982. On March 3, 1982, there was also filed by Builder's Electric, Inc., a lien claimant, a motion to dismiss under the provisions of § 1112(b) of the Bankruptcy Code, accompanied by extensive memorandum.

On March 1, 1982, or thereabouts, the law firms of which Mr. McCullen and Mr. Philpott, respectively, were partners, merged.

On February 22, 1982, Mr. McCullen, although then representing the debtor, had filed an application by three investors, classifying them as unsecured creditors, to have them constitute an unsecured creditors' committee. The application stated that the three and approximately 174 others had invested a total of about $2,100,000 with Allied and McFarland. In the application, signed by McCullen and Safley on behalf of these investors, it is recited that the three investors have no contractual or other relationship with the debtor except that the debtor had admitted the debts as scheduled unsecured debts of the debtor. Affidavits of the three investors accompanied the affidavit, prepared by attorney Larry Roloff, and the application was accompanied by a motion to appoint Roloff as attorney for the creditors' committee. Although he has acknowledged serving as attorney for individual creditors, Mr. Roloff had made no showing of compliance with § 1103(b) of the Bankruptcy Code.

On March 3, 1982, Safley filed an application to employ Bullier and Bullier Realtors as leasing agent for the purpose of leasing or releasing rental properties of the Chapter 11 estate, prepared by attorney McCullen.

On March 10, 1982, the firm of Armstrong, McCullen, Percy and Philpott, P.C., prepared and filed for the debtor, an application and proposed order for the debtor to employ MJS Real Property, Ltd., dba Riverside Realty, an Oregon corporation, businesses operated by Safley, to sell under listing agreements three buildings, properties in the Gateway Loop properties, one being the Union Building, the subject of the

foreclosure involved. The application was signed by Safley as president of the debtor. Also filed by the debtor was a motion to appoint an appraiser.

On March 15, 1982, a motion to dismiss was filed by J.I. Johnston Construction Co., the general contractor for the Union Building and the plaintiff in a lien foreclosure proceeding pending in the Circuit Court of the State of Oregon for Lane County.

On March 16, 1982 Columbia filed a motion to require the debtor-in-possession to recover funds, sums paid to the debtor's attorneys since December 22, 1982, and to Safley, since the filing of the case. In addition, on March 16, 1982, Columbia filed objections to claims of all creditors forwarded for filing on the ground that I–5 had no creditors immediately prior to the filing of the petition in Chapter 11.

On March 17, 1982 a lien claimant, Chase Company Mechanical Contractors, Inc., filed a motion to dismiss on the ground that the proceeding was not filed in good faith.

Also on March 17, 1982, McCullen, as a member of the new firm of Armstrong, McCullen, Percy and Philpott, P.C., filed on behalf of the debtor an application signed by Safley as president of the debtor for appointment of Mr. Safley's Riverside Realty as property manager of all the real properties of the Chapter 11 estate with a proposed property management contract dated February 2, 1982, with a schedule of stated charges and hold harmless clause signed by Safley as a representative of both entities.

On March 18, 1982, notice of hearing on the above motions was noticed for March 31, 1982.

In the adversary proceeding, 682–7047, Columbia had filed on March 16, 1982, a motion to disqualify the debtor's attorneys for conflict of interest alleging their representation of others in the proceedings who asserted liens against the property of the Chapter 11 estate in the state court lien foreclosure cases, and as in violation of 11 U.S.C. § 327(a) and (c) and 11 U.S.C. § 1107. Not until March 22, 1982, did counsel in response to the March 16 motion, file their own motion to withdraw as counsel because of conflict of interest. The response also included a motion to postpone the trial.

On March 23, 1982, attorneys for Columbia and Mr. Philpott appeared. Also present was Mr. Lawrence Cooley, who was presented as possible successor attorney for the debtor, and who asked for additional time and continuance and reported that he was as yet only considering representation of the debtor unless continuance could be arranged.

The problem of the partial transfer of Allied's and McFarland's assets was discussed and the problems posed in connection therewith. Mr. Cooley thereafter on March 25, 1982, presented amended asset schedules for the debtor reflecting an assignment of assets consisting of promissory notes and various contracts receivable and stocks of Allied Real Estate Securities, Inc., owned by Allied Commercial Realty Co., and/or A.W. McFarland. The assignment did not, however, assign all the assets of Allied Commercial Realty.

Contemporaneously therewith, Mr. Cooley filed as attorney for the plaintiff adversary proceeding 682–7099, I–5 Investors, Inc., against Allied Real Estate Securities, Inc., an Oregon corporation, Allied Commercial Realty Co., an Oregon corporation, and A.W. McFarland, an individual, on a demand note executed by McFarland on behalf of Allied Real Estate Securities, Inc., Allied Commercial Realty Co., and A.W. McFarland for $527,000 upon which McFarland also signed a confession of judgment for such amount the same day.

The assignments and confession of judgment were apparently conceived to cleanse the case of the isolation of assets problems. No showing is made as to the basis of the amount of the note, nor if it is representative of the assets of the McFarland entities. The record further reflects an agreement by Safley that in the event the Chapter 11 proceedings are dismissed, the confessed judgment will be satisfied and the assignment revoked.

At the trial on March 31, 1982, Safley under examination by the attorney for Builder's Electric, Inc., a lien claimant which had filed a motion to dismiss, acknowledged that after the filing of the petition, he had received from McFarland a conveyance of some of McFarland's and Allied's interests in developments other than the Gateway Loop property, to Safley personally, after having testified that he believed the assignments to I-5 provided all or all that were known of the assets of the McFarland entities.

Safley, as president of a corporation, was not entitled to represent his corporation in court proceedings. He is not an attorney. He urged continuance because his attorney was not in attendance. The motion was resisted by Columbia as a party seeking relief from the automatic stay, and whose attorney had traveled from Portland with witnesses to proceed after stipulated trial date was waived as to the 30-day rule of § 362(e) of the Bankruptcy Code. Mr. Roloff was present as attorney for certain investors as parties in interest and was allowed to participate without objection. He represented that in his view the interests of the debtor headed by Safley were common with the interests of his "investor" clients on the matters before the Court, and throughout the proceedings, although Mr. Roloff was not attorney for Safley and the debtor, they acted in concert and Safley relied on Roloff's advice. Under the circumstances of the time constraints on a matter involving relief from the automatic stay, and the history of the proceedings, the Court concluded that granting continuance would be an unfair and improper delay over objection of the plaintiff and not a proper exercise of the Court's discretion.

Plaintiff Columbia introduced testimony and evidence from two appraisers. One, Mr. C. Spencer Powell, offered an appraisal on the income approach showing a present fair market value of the Union Building property of $1,030,000 which allowed in its basis a deduction of $270,000 for costs incidental to the production of the income stream. The other appraiser, Gerald L. Curtis, also chose the income approach to value and stated that in his opinion the fair market value of the building and land would be $975,000. Also an engineer, Michael Bye, P.E., was called and claimed his inspection of the premises showed construction defects needing corrections with an estimated $111,600 cost for remedial work. An officer of Columbia, Robert Fuchs, testified that as of March 31, 1982, the balance due on the debt was $1,008,364.30, with interest currently accruing at the rate of $14,913.60 per month.

Mr. Roloff called as witnesses Corporation Commissioner Frank Healy and his staff member Tom Higashi, who testified in substance as related in the narrative above.

Mr. Roloff also called Michael J. Safley as a witness and Mr. Safley narrated his connection with the venture as related earlier in this Opinion, and urged his desire to assist those who had invested money with the McFarland organizations. Although he ventured information that he had a possible non-cash offer pending for the Union Building of $1,500,000 and that he proposed to list it for $1,800,000, Safley said he had not done an appraisal on it. No proof was offered that the Union Building was necessary to the debtor's reorganization. No showing of adequate protection was offered other than unsupported reference to an equity cushion.

The obligation due Columbia is over and above the lien claims asserted in the state court.

The Court took the matter of relief from the stay under advisement to enable consideration of the numerous exhibits offered, and proceeded to hear argument on the motions to dismiss.

Arguments were made by Mr. Warren on behalf of Columbia, Mr. Douglas Schultz on behalf of Builder's Electric, Inc., and Ms. Laura Walker on behalf of C. Anderson Griffith, a partner of Springfield Investments, a creditor which asserts title to three of the buildings on a portion of the remainder of the 6.1 acres, Gateway Loop. Their arguments were joined in by Mr. Malcolm Brand on behalf of lien claimant Johnston.

All urged the Court to dismiss the proceedings on the basis of a bad faith filing.

■ Initial judicial impulse is to dismiss the case as abusive of the judicial process and perpetuation of a potential vehicle for fraud upon creditors. Closer scrutiny, however, impels the Court to pause because of a tender concern for unfortunate investors in the scheme for development of the properties to which the debtor now holds color of title, together with substantial indicia of ownership of any other assets of the transferors to which no challenge has yet been presented opposing the transfers as in fact fraudulent to any unsecured creditor.

The secured creditors holding liens, and a transferee from a secured interest which received a purported escrowed conveyance from Allied and McFarland, now challenged in litigation, have effectively pointed out the dilemma facing the Court, and the detriment to secured interests involved by the vehicle used by the transferors, McFarland and his Allied organizations, and the transferee, which will delay and frustrate realization of secured rights and other property rights asserted against the property of the transferors, now transferred to the new entity, I–5.

■ Examination of the cases in which the courts have been faced with this type of problem which some have labelled the "new entity syndrome" leads to the conclusion that under the Bankruptcy Code, such a transfer is not universally subject to dismissal as a bad faith filing. Such transactions are, however, subject to close scrutiny and should not be allowed to be detrimental to unsecured creditors, nor if their only purpose is to frustrate secured creditors with little or no prospect of development of a feasible plan.

The debtor has lawsuits pending which may or may not generate assets for development of a plan. Until the litigation is concluded, dismissal would appear premature. See *In re L.N. Scott Company, Inc.,* 13 B.R. 387, 7 B.C.D. 1280, (Bkrtcy.E.D.Pa. 1981). Evidence has not been produced of the value of the property other than the Union Building encumbered to Columbia, nor as to whether equity exists therein.

■ Mere delay imposed upon secured creditors is, however, not a sufficient basis for dismissal. Inherent in the Congressional scheme for rehabilitation of struggling enterprises is the pause to plan a reorganization, with provision for various protections to secured creditors. See, *Matter of Northwest Recreational Activities, Inc.,* 4 B.R. 36 (Bkrtcy.N.D.Ga.1980).

The new entity syndrome if used to isolate assets of a transferor to the new entity may constitute a fraud on the unsecured creditors of the transferor. Assumption of new obligations without consideration by the transferee may fraudulently dilute the assets of the transferee which would be available to other already existing unsecured creditors of the transferee.

However, no unsecured creditors of either the transferor nor of the transferee in this case have alleged that the transaction has been detrimental to them or prejudicial to their interests. Those appearing support the transfers.

Those moving for dismissal are secured creditors involving one of several buildings on the Gateway Loop lands, the Union Building, and the purported transferee of a portion of the remainder of the property, claiming rights therein as transferee from a previous secured creditor claiming title to an alleged escrowed conveyance based upon default. This transfer, the debtor in these proceedings has challenged in pending litigation.

■ Any contention by any unsecured creditor of the transferors to the debtor herein that such creditors' interest had been prejudiced would, if supported, be a basis of showing probability of the transfer being fraudulent in law and support a finding of bad faith filing under the new entity syndrome. The same might be true if an existing unsecured I–5 creditor with debt due before the filing of the petition which might dilute assets, if any, of I–5 by placing obligations owed by the transferors but not previously by I–5 on schedules without dis-

tinction were to challenge such transaction as prejudicial to such creditor would also imperil the transaction as fraudulent in law. Without any contention by any unsecured creditor of prejudice, but on the contrary, the urging of all those who have appeared, that unsecured creditors have not been prejudiced, the Court can only with skepticism speculate that what might be, is, if it is to dismiss on such basis.

Allied and McFarland have made transfers to I-5 solely for the purpose of bringing this proceeding, and because the isolation of assets was a most questionable purpose, confessed judgment and made assignments thereby further transferring portions of its assets unrelated to the Gateway Loop properties to the new enterprise. A more questionable transfer was made by Allied and McFarland to Safley, the sole stockholder and president of I-5, personally thereafter. The record before the Court does not establish what assets and liabilities Allied and McFarland may have which have not been transferred. The record does reveal apparent financial inability to finance the Chapter 11 proceeding once contemplated by Allied. Such inability does not, however, conclusively establish Allied without assets as distinguished from liquid or cash assets.

A case which appropriately addresses the questions involving relationship between cases decided under the Bankruptcy Act and the current Bankruptcy Code, is *Matter of Northwest Recreational Activities, Inc.,* supra. The court's discussion of relief under the Code at page 42 is appropriate:

"The known fear of personal involvement and the desire of individuals to protect personal assets from jurisdiction in a bankruptcy case is so great that the organization of a new entity by a partnership or individuals incident to the transfer of partnership or individual property to such new entity and the filing of a Chapter 11 petition, as here, is highly suspect as to jurisdiction over said entity and assets. The Bankruptcy Court will thoroughly review the facts of such pre-bankruptcy actions to determine whether the rights of creditors to exercise collection rights have been altered or offended adversely. The circumstances should receive the closest scrutiny of the Bankruptcy Court relative its jurisdiction over said fresh entity in order to determine whether jurisdiction has been improperly conferred by fraudulent acts of the debtor against the interests of creditors. *Shapiro,* [*v. Wilgus,* 287 U.S. 348, 53 S.Ct. 142, 77 L.Ed. 355] supra.

"Yet, the test is not merely whether a transfer of property and a change of entity occurred on the eve of the petition for relief under Chapter 11. Such a test would void all such actions occurring on the eve of filing. It would present an issue involving all pre-petition actions, (i.e., the issue being when are such actions beyond the period of the eve of bankruptcy; how far does the period of eve of bankruptcy extend to prior transfers? The timeliness of the change of entity and/or transfer of property is not controlling. The test suggested in *Shapiro* and its progeny seems to be whether any of the substantive or procedural rights of any of the creditors to assets, available prior to the transfer of the property, have been altered or eroded by the transfer and subsequent Chapter 11 filing.

"It is the detriment to the creditors, not the advantage to the prior partnership and partners, which this court deems more relevant to the issue of whether the creditors are fraudulently hindered or delayed by the Chapter 11 filing. Here, the entry of the new investor and the organization of the corporation and simultaneous transfer of the secured creditors' security to the corporation, and the assumption of all prior debts by the new entity, provided to the creditors restrained by this Chapter 11 case the same real property security as had protected such creditors prior to the transfer. No property or personal liability has been removed from or made less available to any creditor. Here, there are three mortgages on the country club real property and no known wage or trade or other

unsecured creditors. The evidence is that the value of the real property slightly exceeds the amount of the debt of the lien creditors.

The new corporate entity additionally offers the creditors the alleged advantages of the managerial experience of the new individual investor-manager, and the potential of greater financial resources through this new individual investor than existed prior to the transfer and creation of the new entity. Despite the delinquency in monthly payments of the first and second mortgages that triggered the foreclosure action which was pending at the time of filing, the Debtor now has alleged financial resources sufficient to comply, and is complying, with this court's prior order of adequate protection which requires the timely payment of the contract mortgage amounts as they become due after date of filing of the complaint for adequate protection.

"[4] In conclusion, the corporate debtor has submitted assets and financial resources to the jurisdiction of this Court, for administration of the claims of its creditors no less than, perhaps more than, that available for such claimants from the security of the property and liability of the partnership and partners prior to the transfer and organization of the debtor corporation and the filing of this Chapter 11 petition. Thus, there has been no fraud upon creditors and no creditor has not been wrongly hindered or delayed in the potential collection of a claim. The delay which has occurred by this filing resulting from the stay is procedural, not substantive, and the authority to file, stay and delay (i.e., Chapter 11 relief) was available to the partnership prior to the organization of this petitioning debtor."

See, also, *In re Dutch Flat Investment Co.,* 6 B.R. 470 (Bkrtcy.N.D.Ca.1980) distinguishable because of the absence of scheduled unsecured creditors.

As to the scope of the Court's powers under the Code, see *Matter of Century City, Inc.,* 8 B.R. 25, (Bkrtcy.N.J.1980).

■ The Court, under the Bankruptcy Code, is vested with broad discretionary powers in Chapter 11 proceedings. See *In re Victory Construction Co., Inc.,* 9 B.R. 549, 558, (Bkrtcy.C.D.Ca.1981) wherein the court notes:

"The provisions of the Code dealing with rehabilitation and reorganization must be viewed as direct lineal descendants of a legal philosophy solidly embedded in American Bankruptcy law. Review and analysis of Sections 74, 75, 77, 77B, Chapters IX, X, XI, XII and XIII, and cases decided under these sections, disclose a common theme and objective; avoidance of the consequences of economic dismemberment and liquidation and the preservation of ongoing values in a manner which does equity and is fair to rights and interests of the parties affected. But the perimeters of this potential mark the borderline between fulfillment and perversion; between accomplishing the objectives of rehabilitation and reorganization and the use of these statutory provisions to destroy and undermine the legitimate rights and interests of those intended to benefit by this statutory policy. That borderline is patrolled by courts of equity, armed with the doctrine of good faith..."

" 'A court of equity may, in its discretion, in the exercise of the jurisdiction committed to it, grant or deny relief upon performance of a condition which will safeguard the public interest. These principles are a part of the control which the court has over the whole process of formulation and approval of plans of composition or reorganization...' "

■ In the adversary proceeding, 682-7047, in which Columbia seeks relief from the automatic stay to continue its nonjudicial foreclosure of its trust deed, on the record pursuant to § 362(d) of the Bankruptcy Code, there has been no adequate protection offered by the debtor as provided by § 361 of the Bankruptcy Code, nor has it been shown that such property, being only one of several buildings on the developed property, is necessary to an effective reor-

**356**

ganization. Columbia is therefore entitled to a modification of the automatic stay. The current revenues from the Union Building are insufficient in substantial amount to meet the accruing debt service charges. Unless, therefore, the debtor shall within 30 days of the date of this Opinion, bring current the arrearages under the loan agreement and make provision for continued payment according to the terms of the agreement, or otherwise cure the default, Columbia may present an order granting relief from the stay.

Motions for dismissal of the case are further aided by the failure of the debtor to post an ordered bond with the penal indemnity clause providing indemnity against loss or diminution of assets in the event of ultimate liquidation. I–5, the debtor, had at its inception capital of only between $1,000 and $2,000, advanced to commence these proceedings. It contemplated collecting rents of the troubled properties and paying management fees to its affiliates and handling possibly controverted funds. A bond of $25,000 was ordered and has not been furnished in proper form. Unless within four days from the date of this Opinion such is filed, the Chapter 11 case 682–07009 will be Ordered Dismissed. If such bond in proper form is filed, the motions for dismissal will be denied, without prejudice to their renewal in the event any unsecured creditor of Allied Commercial Realty Company, Allied Real Estate Securities, Inc., or A.W. McFarland shall claim that the transfers have been prejudicial, or if any unsecured creditor of I–5 Investors, Inc., contends that the transfer is prejudicial to such creditor.

This Memorandum Opinion contains the Court's Findings of Fact and Conclusions of Law and pursuant to Bankruptcy Rule 752, they will not be separately stated.

Orders and Judgments consistent herewith will be entered.