**In re DRESKE GREENWAY TRUST, Debtor.**

**Bankruptcy No. 81–00707.**

United States Bankruptcy Court,
E. D. Wisconsin.

Sept. 22, 1981.

F. M. Van Hecke, Milwaukee, Wis., for movant.

Jack U. Shlimovitz, Ludwig & Shlimovitz, S.C., Ronald J. Jaskolski, Milwaukee, Wis., for the debtor, Dreske Greenway Trust.

Harold J. Sanville, Elm Grove, Wis., for Frank and Charlotte Latina.

### DECISION

D. E. IHLENFELDT, Bankruptcy Judge.

George Dreske, a creditor (hereinafter referred to as Dreske), has moved to dismiss this chapter 11 case on the ground that the court lacks subject matter jurisdic-

tion in that the debtor is a trust which is not eligible to file for relief under the Bankruptcy Code. Its eligibility to file depends upon whether or not it is a "business trust" within the meaning of § 101(8) of the Code.[1] The issue of subject matter jurisdiction may of course be raised at any time.[2] In this case, the motion to dismiss was filed on August 31, 1981, some 5½ months after the chapter 11 petition was filed on March 11, 1981, and after certain adversary proceedings were litigated and decided contrary to Dreske's liking.

An evidentiary hearing was held on the dismissal motion on September 15 and 16, 1981. The evidence presented together with the court's files, of which judicial notice is taken, gives the following picture.

Negotiations which began in October or November, 1979, in which Dreske and Frank Latina were the principal participants, bore first fruit on December 28, 1979. On that date, after a number of false starts by the parties' attorneys because of problems with tax consequences and financing, the following actions were taken. A trust instrument (Ex. 4) was executed creating the Dreske Greenway Trust, the debtor (hereinafter referred to as the Trust), naming as both grantors and trustees Dreske's three children, Donald Dreske, Kenneth Dreske and Karen Ann Dreske Wiggins. Named as beneficiaries were "the issue of the grantors, including children, grandchildren and more remote issue." The three grantors transferred $150 to the trust in the form of a check from Donald Dreske.[3] The Trust then borrowed $85,000 from Dreske which was used immediately as a down payment on a $287,000 land contract for the purchase of real estate from the Jungbluth family in New Berlin, Wisconsin, the total purchase price of such property being $405,-000.

---

1. Subject to some exceptions not relevant here, §§ 109(b) and (d) provide that a "person" may be a debtor under chapter 11. § 101(30) defines "person" to include a corporation, which in turn, as defined in § 101(8), includes a "business trust."

2. *In re Citizens Bank & Trust Co.*, 8 B.R. 812 (Bkrtcy.1981); 20 Am.Jur.2d, Courts § 95.

3. So far as the record shows, this was the only money or property transferred to the Trust by the grantors.

On January 28, 1980, after negotiations in which Dreske was again the principal participant, the following additional transactions took place. The Trust borrowed an additional $100,000 from Dreske and used this as a down payment on a land contract for the purchase from Frank Latina of the Blue Crest Motel situated in Wauwatosa, Wisconsin. Included in the purchase were a bar and restaurant which were operated in conjunction with the motel. In addition to the land contract, the Trust entered into a lease-purchase agreement (Ex. 9) with Latina for the personal property on the premises. Dreske personally guaranteed the land contract obligation, and also gave a $25,000 personal note to Mrs. Frank Latina as additional security. As a part of the deal, the Trust sold the Jungbluth property to Latina by way of a $550,000 land contract (Ex. 10), Latina however being given a $100,000 credit on this amount in consideration of the Blue Crest Motel transaction, so that Latina owed only a net of $450,000 on the Jungbluth property contract.[4] Finally, Dreske and his children organized a new corporation, Bluecrest Management Corp., to operate the motel property. This corporation was wholly owned by another corporation, Aries, Ltd., a holding company which also owned a number of other corporations of the Dreske family. The officers and directors of the Bluecrest and Aries corporations, as well as the stockholders of Aries, Ltd., were the same three Dreske children who were the grantors and trustees of the Trust.

Latina vacated the motel property on January 31, 1980, and the Dreskes took over on February 1, 1980. On March 1, 1980, the Trust entered into a 25 year lease agreement (Ex. 5) with the Bluecrest Management Corp. (hereinafter referred to as the corporation). Donald Dreske testified that he could not find the original of this lease, but that as trustee he had signed the lease on behalf of the Trust, and as an officer of the corporation, he had also signed it on behalf of the corporation. The lease provided for $20,000 monthly rental payments to be made by the corporation to the Trust beginning on March 1, 1980. The Trust in turn was obligated to pay Latina about $15,800 each month. An entry in the corporation's minute book dated January 31, 1981, some 11 months later, recites that the corporation approved the lease on that date.

Donald Dreske managed the daily operations of the motel. He testified that he was paid by the corporation, as were the other employees, and that the corporation paid rent to the Trust which in turn made the monthly payments to Latina. In point of fact, the corporation never did pay any rent as such to the Trust, but instead merely transferred sufficient funds each month to enable the Trust to meet its $15,800 monthly obligation to Latina.[5] In not one single month did the Trust collect its $20,000 from the corporation. Later on when money became even tighter and it became necessary to speed up the payment process in order to avoid a default in payment to Latina, the corporation made a number of payments directly to Latina, ostensibly "on behalf of the Trust."[6] At least a part of the cash shortage problem must have resulted from the fact that the Dreskes transferred funds from the motel operation to other corporations which they owned or controlled. Donald Dreske testified that funds were transferred back and forth between such corporations in this manner, depending upon which was in need of cash at the moment, and the corporation's tax return for the year ending September 30, 1980 (Ex. 8)

---

4. Latina apparently never made any payments on this Jungbluth contract, not being required to start making payments until six months after sewer and water were available for installation on the land.

5. This same procedure was apparently followed in February, 1980, the month following the Dreske takeover of the motel and prior to the execution of the lease on March 1, 1980.

6. Delays occurred when either the corporation's bank, or the Trust's bank, refused to honor checks until those being deposited to cover such checks had cleared. On a number of occasions, the checks sent to Latina were returned for insufficient funds.

showed as an asset on that date, "Advances to Affiliates ... \$136,488."

On February 11, 1981, Latina commenced a land contract foreclosure action in the circuit court for Milwaukee County alleging that the trustees of the Trust had failed to make the monthly payments due on January 1 and February 1, 1981. Latina's motion for judgment was scheduled to be heard on March 11, 1981. On the morning of that day, the Trust filed its petition under chapter 11.

On April 6, 1981, Latina filed an adversary proceeding seeking relief from the stay imposed by § 362 of the Code. On the scheduled trial date, April 29, 1981, the Dreskes indicated that they had a buyer for the motel and needed time to work out the financing. The parties then stipulated that an order might be entered vacating the stay, but that such vacation would not become effective until June 1, 1981.[7] It was understood that if the Dreskes could come up with an acceptable buyer and financing within that time, the stay would be continued in order to enable the sale to take place, but this did not happen.

This agreed order vacating the stay effective June 1, 1981 did not end the litigation in bankruptcy court, as had been anticipated by the court and Latina. On June 1, 1981, the Dreskes filed a petition for removal of the land contract foreclosure action from the circuit court of Milwaukee County to this court. Latina promptly moved to remand, but withdrew this motion provided he would receive a prompt hearing in the foreclosure action. The Dreskes again indicated that they had a buyer for the motel property, but that they would need Latina

to help finance the purchase, and they tried to get some indication from him as to what he might be willing to do. Latina stated he would be willing to talk to any buyer they might bring forward, and to discuss the possibility of helping to finance a sale. By agreement, the night auditor at the motel was placed in charge of operations in the interim, and trial was scheduled for July 21, 1981. At the trial on July 21, 1981, the court found that the land contract was in default, that the amount owing as of February 1, 1981 was \$889,211.31, with interest accruing at 8% from that date. The court granted an equity of redemption period until August 31, 1981 for the Trust to come up with the money. Written findings of fact and conclusions of law and a judgment of strict foreclosure were entered on July 29, 1981. The Dreskes were unable to come up with a buyer so as to redeem the property by the August 31st deadline, but on that date George Dreske filed his motion asking that this chapter 11 case be dismissed for lack of subject matter jurisdiction, that all orders and judgments of this court including the July 29, 1981 judgment of strict foreclosure be vacated for lack of jurisdiction, and that Latina be enjoined from entering and taking possession of the motel.[8] The debtor has stated to the court that it does not oppose the dismissal of the chapter 11 case.

◼ Before taking up the issues presented by Dreske's motion, two points should be made. Throughout the varied proceedings in this court, both the court and counsel for Latina were under the impression that the Trust was operating the motel. Neither the Dreskes nor their attorneys ever indi-

---

7. In the meantime on April 15, 1981 the Jungbluths also filed an adversary proceeding seeking relief from the stay, alleging that the Trust had failed to make a yearly installment payment due on January 1, 1981 in the amount of \$43,766.67 principal and interest. At a pretrial conference on May 8, 1981, the parties agreed that the Trust would have until July 1, 1981 to pay the sum of \$43,000, and until September 1, 1981 to pay the balance, with the stay to be vacated in the event such payments were not made. When the Jungbluths' attorney filed an affidavit on July 16, 1981 stating that the mo-

nies had not been paid, an order was entered vacating the stay forthwith as to the Jungbluth property.

8. Dreske's motion refers to him as a creditor with a secured claim, having a security interest in certain chattels at the motel. No security agreement was produced at the hearing, and the schedules filed by the debtor Trust list him as an unsecured creditor—the only one so listed. The only other creditors listed therein, as secured, were Mr. and Mrs. Latina and the Jungbluths.

cated this was not the case, and Dreske's motion suggesting that it was operated by a corporation under lease from the Trust came as a complete surprise. Secondly, while Dreske did not attend each and every hearing, he did attend a number of them, and it was always clear that it was he who was calling the shots. He was even a participant in the "family" decision to file this chapter 11 case—the same case which he now asks the court to dismiss. He hardly appears in this court now seeking relief with clean hands. The court feels that it has been "used" by him, and so stated at the hearing on the motion. This is of course a court of equity, and if equitable principles were to be applied here and now, the court would give Dreske and his motion short shrift. Since subject matter jurisdiction can neither be stipulated to, nor objection waived or prevented by estoppel,[9] the court will address itself to that issue.

Dreske contends that the Trust is not a "business trust" within the meaning of § 101(8) of the Code—that a business trust is created for the purpose of carrying on some kind of business or commercial activity for profit, whereas the debtor is a non-business trust whose object is to protect and preserve the trust res on behalf of the children of the trustees for whose benefit it was established. Cited in support of the motion are *In re Treasure Island Land Trust*, 2 B.R. 332, 1 CBC2d 407, 5 BCD 1246 (Bkrtcy.1980), *In re Old Second National Bank of Aurora*, 7 B.R. 37, 6 BCD 1135 (Bkrtcy.1980), and *In re Cohen*, 4 B.R. 201, 2 CBC2d 4 (Bkrtcy.1980).

The decisions in the three cited cases describe trust instruments and trust activities substantially different than those here portrayed. In the *Treasure Island* case, the trust was not engaged in any business activity. The trust instrument itself rejected any construction of it as a business trust. Among other things, it provided, "nor shall the TRUSTEE transact business of any kind with respect to the trust property," and "nor shall this agreement be deemed to be or create or evidence the existence of a corporation de facto or de jure, or a Massachusetts Trust, or any other type of business trust." In the *Bank of Aurora* case, the primary purpose of the trust was merely to hold title to property, and the trustee had no management power without the written consent of the beneficiary. In the *Cohen* case, the trust agreement specified that the trust was not to be considered a business trust, and the trustee had few powers without the written consent of the beneficiaries. The trust res consisted of a single vacant and undeveloped parcel of real property, and by the terms of the trust agreement, a sale of the property would terminate the trust.

In the case at bar, the trust instrument sets out the powers of the trustees in an appendix consisting of four pages plus a portion of a fifth page. The trustees are granted absolute discretion to exercise the numerous powers listed therein subject only to "their fiduciary obligations and responsibilities." They are empowered to sell, deal with, improve, lease, manage and mortgage assets "as if they were the individual owners thereof." Far from being prohibited from engaging in business, to the contrary they are specifically authorized "To carry on any business originally or subsequently transferred hereto; to form and to participate in the organization of corporations; to form partnerships, to enter into joint ventures, syndicates, pools, and any other types of business associations; to use an assumed name, or the name of a nominee or nominees, or their own names, as individuals, with respect thereto as they shall deem advisable."

In exercising these powers, the Trust on the same day it was created borrowed $85,000 from Dreske and used it to buy the Jungbluth property at a total cost of $405,000, sold the property at a profit one month later, borrowed an additional $100,000 from Dreske and purchased the Blue Crest Motel for in excess of $1,000,000, leased the personal property at the motel from Latina for a total rental of $311,040, and finally in

9. *In re Martinez* (10th Cir., 1957), 241 F.2d 345; 20 Am.Jur.2d, Courts § 95.

turn leased the entire motel operation to the corporation for 25 years at a monthly rental of $20,000. As stated in *Treasure Island, supra,* the object of a nonbusiness trust is to protect and preserve the trust *res,* the powers in a traditional trust being incidental to the principal purpose of holding and conserving particular property. The only property that was ever given to this Trust to hold and conserve was $150. Any additional property that it had, it acquired by virtue of its own business activities.

At no time did the three trustees collect or have paid over the $20,000 monthly rental due and owing to the Trust. The corporation was no more than a device to enable them to insulate from the Trust and their responsibilities as trustees transfers of funds to others of the various Dreske corporations, which funds had been earned from the property of the Trust. Far from conserving the property of the Trust, the trustees in their alter ego form as officers of the corporation siphoned off to other Dreske corporations funds which should have been paid over to the Trust. In fact, this Trust was a vehicle created by the Dreskes for the specific purpose of engaging in business, and they used it as such. The court finds that the debtor is a business trust within the meaning of § 101(8) of the Bankruptcy Code and is included within the term "corporation" as defined in that section. Accordingly, it is eligible to file for relief as a debtor under the Code, and this court has jurisdiction over the case.

The debtor itself has indicated it does not oppose dismissal of the case, and there are no other parties in interest seeking its continuance. Under all of the circumstances, the court believes that a dismissal of the case would be in the best interest of the creditors and the estate, and that the case should be dismissed, but for the reason that there appears to be no likelihood whatever that any sort of plan can be effectuated.

This decision shall stand as and for findings of fact and conclusions of law pursuant to Bankruptcy Rule 752.