In re UNIVERSAL CLEARING HOUSE COMPANY, a Trust, aka National Clearing House Company, a Trust, Debtor.

In re INDEPENDENT CLEARING HOUSE COMPANY, a Trust, Debtor.

In re ACCOUNTING SERVICES COMPANY, a Trust, Debtor.

Robert D. MERRILL, Trustee, Plaintiff-Appellee,

v.

Chad ALLEN, et al., specifically David Manning, Lee Manning, Ray Manning, Keith Manning, Earl Manning, R.J. Rucker, Ron Fish, dba F Street, Thomas R. Garza, and Monty W. Brown, Defendants-Appellants.

Bankruptcy Nos. 81–02887, 81–02886 and 81–3704.

Case Nos. C–85–0650J, C–85–0652G, C–85–0655G, C–85–0597W, C–85–0598W, C–85–0600W, C–85–0601W, C–85–0602W and C–85–0603W.

United States District Court, D. Utah, C.D.

April 22, 1986.

William G. Fowler, Salt Lake City, Utah, Robert D. Merrill, trustee, Salt Lake City, Utah, for trustee of debtors.

Daniel W. Jackson, Salt Lake City, Utah, for defendants Ron Fish, dba "F" Street and Thomas R. Garza.

David Manning, Lee Manning, Earl Manning, Keith Manning, Glen Manning, Ray Manning, Monty W. Brown, R.J. Rucker, pro se.

### MEMORANDUM DECISION AND ORDER

WINDER, District Judge.

This matter is before the court on appeal from the United States Bankruptcy Court for the District of Utah. The court heard oral argument on December 17, 1985. William G. Fowler appeared on behalf of the trustee, Robert D. Merrill ("Merrill") and Daniel W. Jackson appeared on behalf of appellants, Ron Fish, dba "F" Street ("Fish") and Thomas R. Garza ("Garza"). Appellants R.J. Rucker, David Manning and Ray Manning appeared *pro se*. Following argument, the court took the matter under advisement. After reviewing the record, the arguments of the parties and their counsel and the pertinent authorities, the court now enters the following decision and order.

## Background

These consolidated cases arise from the collapse of an alleged Ponzi scheme.[1] The related debtor entities (the clearinghouse companies) were created in 1979 as "Massachusetts" or business trusts, domiciled in the Grand Cayman Islands, British West Indies. The stated business purpose of the clearinghouses was to solicit funds from private investors, called "undertakers," and to use the invested funds to assume the debts and pay the creditors of various client companies. In theory, the clearinghouses would be able to pay their clients' accounts payable at a discount by offering to pay the creditors before the accounts came due. The clients would then pay the clearinghouses the full amount at a later date. The difference between the sums repaid by the clients and the discounted amounts the clearinghouses paid the creditors would provide the undertakers with a handsome return on their investments. In fact, there were no client companies. Money obtained from later investors was used to pay "interest" to earlier investors, creating the illusion that the companies were making money.

On September 16, 1981, Independent Clearing House Company and Universal Clearing House Company filed petitions for relief under chapter 11 of the Bankruptcy Code (the "Code"). Accounting Services Company filed a chapter 11 petition on December 17, 1981.[2] On September 25, 1981, the bankruptcy court appointed a trustee pursuant to 11 U.S.C. § 1104. On October 26, 1982, the original trustee resigned, and the court appointed Robert D. Merrill as successor trustee. On March 16, 1982, Mr. Merrill, as trustee, brought the above entitled adversary proceeding to recover funds that the debtors had transferred to approximately 127 sales agents as commission payments for inducing investors to invest with the clearinghouses.

At noticed hearings on March 12 and May 29, 1984, the bankruptcy court considered a motion for summary judgment filed by the trustee. The Honorable John H. Allen took the matter under advisement and, on May 3, 1985, issued an unpublished memorandum opinion granting summary judgment for the trustee.

In its memorandum opinion, the bankruptcy court found that, based upon the pleadings, answers to interrogatories and affidavits, there were no genuine issues of material fact.[3] Based on the undisputed

---

1. A "Ponzi" scheme, as that term is generally used, refers to an investment scheme in which returns to investors are not financed through the success of the underlying business venture, but are taken from principal sums of newly attracted investments. Typically, investors are promised large returns for their investments. Initial investors are actually paid the promised returns, which attract additional investors.
  *Merrill v. Abbott (In re Independent Clearing House Company)*, 41 B.R. 985, 994–95 n. 12 (Bankr.D.Utah 1984) (citation omitted). For the colorful history of Ponzi schemes, see *id.* and works cited therein.

2. Orders for relief were later granted against two related entities—against Tonder Payable Service Company on April 29, 1982, and against Payable Accounting Company on August 16, 1982.

3. The undisputed facts found by the bankruptcy court with regard to the sales agents were as follows:
  (4) Each sales agent's commissions were determined by the aggregate dollar value of the investments he or she solicited.

  (5) In 1980 and 1981, several thousand investors deposited sums totaling more than 29 million dollars with the debtors.
  (6) Between October, 1980, and August, 1981, the sales agents received approximately three million dollars in commission payments.
  (7) Each of the sales agents received training instructions in the manner of conducting sales programs or presentations for potential investors.
  (8) The services for which the agents received commissions consisted of receiving training and learning how to explain the program and solicit investments from prospective investors and explaining the investment program to them; delivering signed investment contracts together with the investor's money to their supervisors for approval and acceptance; delivering monthly earnings checks from the debtors to investors; maintaining contact with their supervisors; and answering questions from investors and potential investors relating to the program.
  (9) In connection with the foregoing activities, the sales agents incurred out-of-pocket expenses for which they were not reimbursed by the debtors.

facts, the bankruptcy court held that the commission payments received by the sales agents constituted fraudulent conveyances avoidable by the trustee pursuant to 11 U.S.C. § 548(a)(2). It therefore entered judgments against the defendants for the amounts of the commission payments they had received from the debtors.

In their appeal from these judgments, appellants Fish and Garza argue that: (1) the bankruptcy court's ruling that the transfers were property of the debtors and subject to avoidance under 11 U.S.C. § 548 was erroneous; (2) the bankruptcy court erred as a matter of law in ruling that the services rendered by appellants had no legally cognizable value; and (3) the bankruptcy court abused its discretion in granting prejudgment interest to the trustee. *Pro se* appellants R.J. Rucker and David, Lee, Ray, Earl and Keith Manning argue that: (1) the bankruptcy court lacks subject matter jurisdiction because the bankruptcy petitions filed by the debtors were not filed in compliance with the "good faith" requirements of the Bankruptcy Code; (2) the bankruptcy court lacks subject matter jurisdiction because the debtor enterprises are not "corporations" as contemplated by the Code; and (3) the judgment should be vacated because appellants did not receive notice of the trustee's motion for summary judgment.[4]

### Discussion

#### Jurisdiction

The *pro se* appellants argue that the bankruptcy court lacks subject matter jurisdiction in this case because the debtor entities cannot qualify as "debtors" under the Bankruptcy Code. A motion to dismiss for lack of subject matter jurisdiction may be made at anytime in a proceeding. The issue of subject matter jurisdiction may also be raised for the first time on appeal.

Generally, an appellate court's review of jurisdictional facts is based on a "clearly erroneous" standard, the same standard that applies to appellate review of other factual issues. *See Eaton v. Dorchester Development Co.*, 692 F.2d 727, 732 (11th Cir.1982); *Williamson v. Tucker*, 645 F.2d 404, 413 (5th Cir.), *cert. denied*, 454 U.S. 897, 102 S.Ct. 396, 70 L.Ed.2d 212 (1981). A district court reviewing jurisdictional facts in the context of an appeal from a bankruptcy court should proceed similarly. Bankruptcy Rule 8013.

■ Appellants argue that the debtors in this case cannot qualify for relief under Title 11. Specifically, they argue that the debtor enterprises are trusts which are not classified as "persons" under the code and

(10) None of the sales agents obtained factual information from the principals of the debtors verifying the existence of actual client companies, which were the basis of the purported accounts payable program and whose accounts were actually paid by the debtors. (11) None of the sales agents had actual knowledge that the purported accounts payable program did not actually exist.

\* \* \* \* \* \*

(15) Within one year before the debtors filed petition for relief under Chapter 11, they transferred commission payments to the defendants, as follows:

\* \* \*

| | |
|---|---|
| Monty Brown | $ 4,502.60 |

\* \* \*

| | |
|---|---|
| Ron Fish, dba "F" Street | 19,344.66 |
| Tom Garza, dba American Investment and Bella Enterprises | 11,448.50 |

\* \* \*

| | |
|---|---|
| David Manning, dba Starwest | $259,672.24 |
| Earl Manning | 50,052.00 |

\* \* \*

| | |
|---|---|
| Keith Manning | 1,044.00 |
| Lee Manning | 7,398.40 |
| Ray Manning | 14,997.80 |

\* \* \*

| | |
|---|---|
| R. J. Rucker | 18,413.00 |

*Merrill v. Allen (In re Independent Clearinghouse Company)*, No. 82–PA–0253, slip op. at 6–7 (Bankr.D.Utah May 3, 1985).

4. Portions of the brief filed by the *pro se* appellants are a photostatic copy of the defendants'/appellants' brief prepared by Edwin F. Guyon, Esq. and filed in consolidated case No. C–84–0927W.

are therefore not eligible for relief.[5] If the debtor enterprises are ineligible for relief under the Code, then the statutory source of the bankruptcy court's exercise of jurisdiction is lacking and the case must be dismissed.

The focal point of this issue is whether the enterprises are business trusts. The Code's definition of "persons" includes "individual, partnership, and corporation." *Id.* at § 101(33). The definition of a corporation encompasses, among other entities, a "business trust." *Id.* at § 101(8)(A)(v). The parties agree, and this court concludes that in order to qualify as debtors under Chapter 11, the clearinghouses must be business trusts.

The nature of the trusts that the clearinghouses purport to be and the language of the trust instruments are not set forth in the record as precisely as they might be. For our purposes, however, the record contains enough evidence to rule on whether the clearinghouses can qualify as business trusts under the Code.

The legislative history of the Bankruptcy Code discusses the definition of "corporation" in general:

> The definition of "corporation" in paragraph (8) is similar to the definition in current law, section 1(8). The term encompasses any association having the power or privilege that a private corporation but not an individual or partnership, has; partnership associations organized under a law that makes only the capital subscribed responsible for the debts of the partnership; joint-stock company; unincorporated company or association; and business trust.

S.Rep. No. 989, 95th Cong., 2nd Sess. 22, *reprinted in* 1978 U.S.Code Cong. & Ad. News 5787, 5808. *See also* H.R.Rep. No. 595, 95th Cong., 1st Sess. 309 (1977) (containing identical language), *reprinted in* 1978 U.S.Code Cong. & Ad.News 5787, 6266.

A number of cases have ruled on whether various debtor trusts can qualify as business trusts for bankruptcy purposes. None of those cases, however, have considered trusts that are similar to the trusts involved as debtors in this case. The reported cases, like the legislative history, focus on the similarities between the trust in question and a corporation in determining whether the trust can be classified as a business trust. A frequently cited case succinctly identifies the distinctions between a business trust and a nonbusiness trust:

> The basic distinction between business trusts and nonbusiness trusts is that business trusts are created for the purpose of carrying on some kind of business or commercial activity for profit; the object of a nonbusiness trust is to protect and preserve the trust res. The powers granted in a traditional trust are incidental to the principal purpose of holding and conserving particular property, whereas the powers within a business trust are central to its purpose. It is the business trust's similarity to a corporation that permits it to be a debtor in bankruptcy.

*In re Treasure Island Land Trust,* 2 B.R. 332, 334 (Bankr.M.D.Fla.1980). The primary consideration in most cases has been the overt purpose of the trust. If its purpose is to protect the trust res, the trust is found to be ineligible for bankruptcy protection. If the purpose is profit oriented, the trust is found to be an eligible business trust. The trusts involved here did not earn a profit but this fact is not determinative. The *purpose* of the trust as represented to investors was to make a profit. In the bankruptcy court's memorandum opinion, Judge Allen found the following fact, among others, to be undisputed:

> (2) The stated business purpose of the debtors was to solicit funds from private investors ... and to use the invested

---

**5.** Section 301 of the Bankruptcy Code provides that only an entity that can qualify as a "debtor" under a chapter of Title 11 can file a voluntary case under that chapter. 11 U.S.C. § 301. The Code further provides that only "persons" can be debtors under Chapter 11. *See* 11 U.S.C. §§ 109(a), 109(b), 109(d).

funds for the purpose of assuming and paying the accounts payable of various client companies. Profits were to be obtained. . . .

*In re Independent Clearing House Co.,* slip op. at 3–4. (Bankr.D.Utah 1984). We find nothing in the record contrary to this finding.[6] The facts provide strong evidence that the trusts were not set up merely to protect the trust res. Notwithstanding the conclusion in hindsight that the operation of the trusts never actually produced any profit, as originally set up, the trusts appeared to be typical profit-oriented investment schemes.

■ In nearly all cases, trusts which have been denied status as business trusts under the Bankruptcy Code have been "simple land trusts" created under trust agreements that strictly limited the authority of the trustees. In distinguishing *Treasure Island* and other decisions involving such trusts, a bankruptcy court in Florida stated:

This Court has considered the *Treasure Island* and *Cohen* [4 B.R. 201 (Bankr.S. D.Fla.1980)] cases and is satisfied that neither of these furnish persuasive support for [the appellant's] position. . . . When one considers and compares the trust agreement involved in *Treasure Island* with the trust agreement involved in this case, it is evident that there are a number of important differences. In this case the Trustee has the power to lease, sell, finance, mortgage, or otherwise dispose of trust properties. In *Treasure Island*, the Trustee had none of these powers. The trust in this case was formed for the express purpose of developing, operating, leasing and selling trust property for the economic benefit of the beneficiaries. In the *Treasure Island* case, the trust was formed only to hold the trust property in order to protect and conserve it. Clearly, the facts in *Treasure Island* are distinguishable from the instant case.

*In re Arehart,* 52 B.R. 308, 309–10 (Bankr. M.D.Fla.1985). *See also In re Tru Block Concrete Products, Inc.,* 27 B.R. 486, 490–91 (Bankr.S.D.Cal.1983); *In re Dreske Greenway Trust,* 14 B.R. 618, 622 (Bankr. E.D.Wis.1981). It is instructive that, in ruling on the nature of the trusts involved, these decisions have looked to what powers were granted to the trustee and on whether the express purpose of the trust was principally profit making or protection of the trust res. We find the reasoning of these cases persuasive and will similarly examine the grant of authority and purpose of the trusts.

■ The clearinghouses' trustees clearly had authority to use the money invested to carry out the stated business purpose of the trusts—assuming and paying their client's accounts payable. Although commodities could apparently be committed to the trusts, the trustee had the right to hypothecate such assets. The entire scheme was consistently represented to be a profit making venture, complete with promises of high returns. Under the facts which the bankruptcy court found to be undisputed, we find that the trusts are properly characterized under section 101(8)(A)(v) as business trusts.

The fact that the trusts never actually made a profit or even engaged in the activities they were set up to undertake does not change our ruling. The critical factors are the type of activity for which the trust was apparently designed and the authority given the trustees to undertake such activities, not whether the trust was in fact successful or whether the trust was properly managed. A business that never makes a profit may be a legitimate business nonetheless. The fact that the trusts' stated activities were never actually undertaken as represented sets forth a case of gross mismanagement, breach of fiduciary duty and fraud, but does not indicate that they were not business trusts. Although the trusts did not actually engage in business,

---

**6.** Although this fact was not set forth in response to a challenge of the subject matter jurisdiction of the court, it was found by the court to be undisputed and can be used by this court in determining subject matter jurisdiction unless it is clearly erroneous.

neither did they actually undertake to protect a trust res. We conclude that the debtor trusts qualify as business trusts under the Code.

The *pro se* appellants also argue that the bankruptcy court lacks subject matter jurisdiction because the debtors filed their petition in bankruptcy in bad faith. This argument is apparently based on the conclusion that good faith is a prerequisite to the existence of subject matter jurisdiction in the bankruptcy court.

Although the former Bankruptcy Act explicitly contained a "good faith" requirement for Chapter 11 filings, the present Bankruptcy Code has no such requirement. Despite this apparent change in the provisions, courts have continued to view good faith as an "implicit prerequisite to the filing or continuation of a proceeding under Chapter 11 of the Code." *In re Dolton Lodge Trust No. 35188*, 22 B.R. 918, 922 (Bankr.N.D.Ill.1982). *See also In re Albany Partners, Ltd.*, 749 F.2d 670, 674 (11th Cir.1984). A great number of bankruptcy court decisions have considered the "good faith" requirement under the Code and have, in nearly all cases, found that a bankruptcy court has equitable power to dismiss a Chapter 11 petition for lack of good faith under 11 U.S.C. § 1112(b).[7]

Judge Ordin, a bankruptcy judge in the central district of California, describes the power given to the bankruptcy court under § 1112(b):

> [T]he bankruptcy court is said to have the inherent discretionary power to prevent the continuation of a proceeding where the court perceives an intent to abuse the purpose of the Code. This is said to derive from the court's general equitable powers. Conduct and transactions of doubtful integrity are measured by and compared to the conduct of a hypothetical debtor who is required to demonstrate exemplary motives and scrupulous good faith as a prerequisite

to obtaining the benefits of rehabilitation in the bankruptcy court. Absent such a motivation, i.e., good faith, the petition may be dismissed.

Ordin, *The Good Faith Principle in the Bankruptcy Code: A Case Study*, 38 Bus. Law. 1795, 1797 (1983) (citations omitted). The Eleventh Circuit has treated the "good faith" requirement in a similar manner:

> [Section] 1112(b) of the Code permits a bankruptcy court to convert or dismiss a case for "cause." The provision lists nine examples of cause, but the list is not exhaustive. The pertinent legislative history states, "The court will be able to consider other factors as they arise, and use its equitable powers to reach an appropriate result in individual cases." H.R.Rep. No. 595, 95th Cong., 1st Sess. 406 (1977), [*reprinted in* ] 1978 U.S.Code Cong. & Ad.News 5787, 6362. Accordingly, the determination of cause under § 1112(b) is "subject to judicial discretion under the circumstances of each case." The equitable nature of this determination supports the construction that a debtor's lack of "good faith" may constitute cause for dismissal of a petition.

*In re Albany Partners*, 749 F.2d at 674 (some citations omitted). Even though a "good faith" standard continues to exist under the Code and assuming *arguendo* that the debtors in this case did not file their petition in good faith, the court must still deny appellants' motion. Appellants are attempting to raise this issue for the first time on appeal. The bankruptcy court did not consider the implications of the "good faith" filing requirement and related jurisdictional matters because none of these issues were raised.

■ As the Eleventh Circuit, Judge Ordin and others have pointed out, dismissal for a lack of good faith in filing is a matter for the bankruptcy court's discretion pursuant to § 1112(b) of the Code. *See also Dolton Lodge*, 22 B.R. at 923; *In*

---

7. The following sources discuss a number of these cases: Ordin, *The Good Faith Principle in the Bankruptcy Code: A Case Study*, 38 Bus.Law. 1795 (1983); Norton, 1985 Annual Survey of Bankruptcy Law, (Callaghan) 686–95; Norton, 1984 Annual Survey of Bankruptcy Law (Callaghan) 425–28.

re Nancant, 8 B.R. 1005 (Bankr.D.Mass. 1981). This issue can be appropriately raised for the first time only in the bankruptcy court. Appellants' attempt to classify this issue as a subject matter jurisdiction question, apparently in an attempt to raise the issue for the first time on appeal, is not well taken. A bankruptcy court's decision to dismiss a petition or convert it to a Chapter 7 filing for a lack of good faith is not a determination that the court lacks subject matter jurisdiction. Rather, such a dismissal or conversion is a determination that, even though the court has jurisdiction over the case, proceeding with the case under chapter 11 would not be in the interests of justice. Although no reported cases directly discuss the relationship between good faith and jurisdiction, in practice, courts have approached these matters as two separate issues. See, e.g., In re Colony Square Co., 22 B.R. 92, 98 (Bankr. W.D.Penn.1982) (considering the "bad faith" argument only after finding that the court had jurisdiction to hear the case), rev'd on other grounds sub nom. Prudential Insurance Co. of America v. Colony Square Co., 29 B.R. 432 (Bankr.W.D. Penn.), appeal dismissed mem., 725 F.2d 666 (3rd Cir.1983). See also In re Dreske Greenway Trust, 14 B.R. 618, 623 (Bankr. E.D.Wis.1981) (holding that the court had jurisdiction over the business trust but dismissing the case under § 1112(b)(2) because of an inability to effectuate a plan).

The question of good faith is factual and will often require the introduction of evidence. When the debtor's good faith is attacked by a motion to dismiss under § 1112(b), the moving party must make a prima facie showing of the debtor's lack of good faith. See Spenard Ventures, Inc., 18 B.R. 164 (Bankr.D.Ala 1982); In re Colony Square, 22 B.R. at 98; In re Century City, Inc., 8 B.R. 25 (Bankr.D.N.J.1980); Ordin, supra at 1841. The hearing of evidence on a factual issue is peculiarly within the bankruptcy court's jurisdiction.

Despite the numerous decisions involving good faith, appellants have not cited a single case and the court has been unable to discover a case in which the good faith question either was raised successfully for the first time on appeal or was in any way linked to a determination of subject matter jurisdiction. As a general rule, this court will only consider issues that were raised before the bankruptcy court. In re Pikes Peak Water Co., 779 F.2d 1456, 1459 (10th Cir.1985). The good faith issue requires an equitable determination and must be considered in the first instance by the bankruptcy court. The issue is, therefore, improperly before this court. The motion to dismiss for lack of good faith filing must be denied.

## Property of the Debtors

Because we have determined that the debtor entities were "corporations" within the meaning of the Code and hence eligible for bankruptcy relief and that the bankruptcy court had subject matter jurisdiction, we must now address the issue of the trustee's power to recover from appellants the prepetition commission payments that they received from the debtors. Appellants contend that the trustee could not avoid the transfers because the debtors, having obtained the property fraudulently, had no interest in the property transferred.

A trustee's powers to avoid prepetition transfers made by a debtor are statutory, and the starting point in any case of statutory interpretation is the language of the statute itself. Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 756, 95 S.Ct. 1917, 1935, 44 L.Ed.2d 539 (1975) (Powell, J., concurring). The relevant statutory language is contained in 11 U.S.C. § 548. Section 548(a) allows the trustee to avoid "any transfer of an interest of the debtor in property" if the transfer meets certain conditions. Appellants contend that the transfers at issue here were not "transfers of an interest of the debtor in property" as that phrase is used in section 548. As a preliminary matter, we must therefore decide whether the money the trustee seeks to recover was property in which the debtor had an interest. If it was not, the trustee has no statutory basis for recovering it.

Nowhere does the Code define "an interest of the debtor in property." Therefore, we must resort to nonbankruptcy law to determine whether payments made to the appellants were transfers of the debtors' property. *See First Federal Savings & Loan Association of Bismarck, Inc. v. Hulm (In re Hulm),* 738 F.2d 323, 326 (8th Cir.), *cert. denied,* — U.S. —, 105 S.Ct. 398, 83 L.Ed.2d 331 (1984); 4 *Collier on Bankruptcy* ¶ 541.02[1] at 541–10 to –11 (L. King 15th ed. 1985) ("the existence and nature of the debtor's interest in property ... are determined by nonbankruptcy law"). Since state law both creates and defines property interests, *Butner v. United States,* 440 U.S. 48, 55, 99 S.Ct. 914, 918, 59 L.Ed.2d 136 (1979), we must look to state law to resolve the question.[8]

The cases are unanimous, both under the old Bankruptcy Act of 1898, Pub.L. No. 62–57, 30 Stat. 544 (codified as amended primarily in former 11 U.S.C. (1976) and repealed in 1978), and under the Bankruptcy Reform Act of 1978, Pub.L. No. 95–598, 92 Stat. 2549 (codified as amended primarily in 11 U.S.C.A. §§ 1–1146 (1979 & Supp. 1985) and scattered sections of 28 U.S.C.A. (1965–76 & Supp.1985)), that a trustee in bankruptcy can recover as preferential and fraudulent transfers at least some payments made by the debtor to investors in a Ponzi scheme, indicating that the funds transferred were the property of the debtors. *Cunningham v. Brown,* 265 U.S. 1, 44 S.Ct. 424, 68 L.Ed. 873 (1924); *Henderson v. Allred (In re Western World Funding, Inc.),* 54 B.R. 470 (Bankr.D.Nev.1985);

*Lawless v. Anderson (In re Moore),* 39 B.R. 571 (Bankr.M.D.Fla.1984). *See also Rosenberg v. Collins,* 624 F.2d 659 (5th Cir.1980) (not a pure Ponzi scheme); *Edmondson v. Bradford-White Corp. (In re Tinnell Traffic Servs., Inc.),* 41 B.R. 1018 (Bankr.M.D.Tenn.1984) (fraudulent transaction).

Appellants argue that prior cases are distinguishable from this one because, under the state law applicable at the time, one who obtained possession of property had defeasible title to that property, even if he obtained it by tortious or criminal means. On the other hand, they argue, under applicable modern law, a person who acquires property of another by fraud has no title to or interest in the property whatsoever.

As support for this proposition, appellants cite *Corporation of the President of the Church of Jesus Christ of Latter-day Saints v. Jolley,* 24 Utah 2d 187, 467 P.2d 984 (1970). There, the Utah Supreme Court stated:

> Where one has stolen or embezzled the money or property of another, he obtains no title whatsoever. A constructive trust may be impressed upon it in his hands; and equity may continue the trustee effective against *any* subsequent transferee, unless transferred to a bona fide purchaser and under circumstances where equity would require a different result.

467 P.2d at 985. Appellants argue that the same rule applies to one who obtains money by fraud—that is, that he obtains no title to the money. *See Heyman v. Kemp (In re Teltronics, Ltd.),* 649 F.2d 1236,

---

**8.** The question naturally arises as to which state's law is applicable. As a general rule, the law of the state in which the property is situated governs questions of property rights. *Johnson v. First National Bank of Montevideo, Minn.,* 719 F.2d 270, 273 (8th Cir.1983), *cert. denied,* 465 U.S. 1012, 104 S.Ct. 1015, 79 L.Ed.2d 245 (1984). Here, the property (money transferred to the defendants by the debtors) was not all situated in one state but was spread throughout many western states. Under such circumstances, a court may not be free to simply apply the law of the forum state to all claims. *See Phillips Petroleum Co. v. Shutts,* 472 U.S. —, 105 S.Ct. 2965, 86 L.Ed.2d 628 (1985). In this case, however,

all the parties have treated Utah law as the applicable law and, if not explicitly consented to it, have at least acquiesced in its application. Even if one of the parties were to contend that the law of another state should apply, no such contention was raised below and hence need not be considered here. *Kenai Oil & Gas, Inc. v. Dep't of the Interior,* 671 F.2d 383, 388 (10th Cir.1982). Moreover, none of the parties has shown us how the law of `other jurisdictions differs from the law of Utah. We shall therefore treat Utah law as controlling where state law applies and where there are Utah statutes or cases on point.

1239 (7th Cir.1981) ("it is settled that property obtained by fraud of the bankrupt is not part of the bankrupt's estate"). *See also, Giannone v. Cohen (Matter of Paragon Sec. Co.)*, 589 F.2d 1240, 1242 (3d Cir. 1978); *Nicklaus v. Bank of Russellville*, 336 F.2d 144, 146–47 (8th Cir.1964) (a trustee in bankruptcy "can have no interest in property acquired by the fraud of a bankrupt" since property obtained by the fraud of the bankrupt "is not properly a part of the assets of a bankrupt's estate"). They reason that if the debtors never had any interest in the money, then it was never the debtors' "property," and the trustee could not avoid the transfers pursuant to section 548.

The trustee does not dispute the fact that all of the money he seeks to recover was obtained by the debtors' fraud. He nevertheless contends that the money was the property of the debtors. Resolution of the issue of ownership of the funds requires an understanding of the effect of fraud on transactions such as those involved in this case. We are not convinced that *Jolley* and the other cases cited by appellants represent the change in the common law that appellants claim they do.

The debtors in these cases solicited investments from "undertakers," who signed "investor contracts" by which they committed to the debtors a specified sum of cash, credit or commodities for a specified period of time, typically nine months or less. The principal amount was to be returned to the investor when the contract expired. Undertakers could elect to receive fixed monthly interest payments for the life of the contract or to receive a single, lump-sum interest payment at the expiration of the contract. The funds committed were to remain under the debtors' custody and control. The money invested in the debtor enterprises was kept in a common fund, from which payments of interest and principal were made, at least initially, according to the terms of the investor contracts. Because the debtors never conducted any legitimate business and thus had no real earnings, they used funds that other undertakers had committed to make the payments of interest and principal to other undertakers.

■ As a general rule, such fraud vitiates a transaction. *Swanson v. Sims*, 51 Utah 485, 170 P. 774, 778 (1918) (denying petition for rehearing). An agreement induced by fraud, however, is merely voidable, not void. *See, e.g., United States v. 1,557.28 Acres of Land*, 486 F.2d 445, 447 (10th Cir.1973); *Tanner v. District Judges of the Third Judicial District Court*, 649 P.2d 5, 6 (Utah 1982); Restatement (Second) of Contracts § 164 (1979). The person defrauded may affirm the contract and sue for damages, or he may rescind the contract, provided that the rights of third persons have not intervened. *Baker v. Casey*, 166 Or. 433, 112 P.2d 1031, 1033–34 (1941). Until disaffirmed, the contract is valid. *Fryer v. Campbell*, 48 Wyo. 122, 43 P.2d 994, 996–97 (1935).

■ In this case, the defrauded creditors did nothing to avoid the transactions. They did not rescind their contracts but rather accepted or anticipated payments according to the contract provisions. Unless the defrauded party takes affirmative action to avoid a contract induced by fraud, property transferred under the contract must belong to the defrauder. The defrauded party may have a claim against the defrauder for damages, but that claim makes him only a creditor. *See* 4 *Collier on Bankruptcy* ¶ 547.19 at 547–73 (L. King 15th ed. 1985). It does not vest in him title to the property with which he has parted. Under these circumstances, we hold that the debtors had an interest in the transferred property within the meaning of section 548.

The *Jolley* case cited by appellants is not to the contrary. *Jolley* involved stolen money rather than money obtained by fraud. The difference between stolen property and property obtained fraudulently was explained long ago:

There is a very obvious distinction between the cases of goods obtained by felony and fraud ...; in the one case, the owner of the goods has no intention

to part with his property; in the other he has. A contract for the sale of goods, though obtained by fraud, is perfectly good, if the party defrauded thinks fit to ratify it.

*White v. Garden,* 10 C.B. 919 (1851), *quoted in* R. Brown, *The Law of Personal Property* § 70 at 237–38 (2d ed. 1955).

The difference is also apparent in the principle that one cannot transfer better title to a chattel than he possess. *See* R. Brown, *supra,* § 67 at 231. One who steals property cannot pass good title to it, even to a bona fide purchaser. *See Western Sur. Co. v. Redding,* 626 P.2d 437, 439 (Utah 1981); *Gurley v. Phoenix Ins. Co.,* 233 Miss. 58, 101 So.2d 101 (1958); *Allstate Ins. Co. v. Estes,* 345 So.2d 265 (Miss.1977). *Cf. Butler v. Farmers Ins. Co.,* 126 Ariz. 371, 616 P.2d 46, 47 (1980) (bona fide purchaser of stolen property has a title defeasible only by the rightful owner). On the other hand, under modern law, a person who obtains property by fraud *can* transfer good title to a bona fide purchaser. *See* U.C.C. § 2–403 (1976); *Paschal v. Hamilton,* 363 So.2d 1360 (Miss.1978). *Contra Hewitt v. Malone,* 105 Ga.App. 281, 124 S.E.2d 501 (1962); *Wyatt v. Singley,* 103 Ga.App. 182, 118 S.E.2d 841 (1961). A person who obtains property by fraud must therefore have title to the property, or at least some legally recognized interest in the property. Thus, although it may be true that one who steals or embezzles property obtains no title to it, one who obtains property by fraud obtains some interest in it, namely, a defeasible title.

9. The bankruptcy court did not address the trustee's claim that the commission payments fit within subsection 548(a)(1), that is, that they were made "with actual intent to hinder, delay, or defraud" creditors. Even if the bankruptcy court had undertaken such a consideration, the issue that would have arisen would be the same as the issue raised under subsection 548(a)(2), that is, whether the appellants gave value to the debtors.

Section 548(c) provides:

Except to the extent that a transfer or obligation voidable under this section is voidable under section 544, 545, or 547 of this title, a transferee or obligee of such a transfer or

We therefore conclude that, when a debtor obtains money by fraud and mingles it with other money so as to preclude any tracing and the defrauded party does not timely avoid the transaction, the money is the property of the debtor within the meaning of section 548 of the Code. As such, it is subject to the trustee's avoiding powers provided the other requirements of section 548 are satisfied.

*Value of Appellants' Services*

The bankruptcy court held that the commission payments received by appellants were subject to avoidance under subsection 548(a)(2).[9] This subsection provides:

(a) The trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of the filing of the petition, if the debtor—

\* \* \* \* \* \*

(2)(A) received less than a *reasonably equivalent value* in exchange for such transfer or obligation; and

(B)(i) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation; (ii) was engaged in business, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital; or (iii) intended to incur, or believed that the debtor would incur, debts that would

obligation that takes for value and in good faith has a lien on any interest transferred, may retain any lien transferred, or may enforce any obligation incurred, as the case may be, to the extent that such transferee or obligee gave value to the debtor in exchange for such transfer or obligation.

11 U.S.C. § 548(c) (1982). Thus, even if the payments to appellants were held to be fraudulent conveyances pursuant to section 548(a)(1), appellants would still be entitled to them to the extent they gave the debtors "value" in exchange for the transfers provided they took the money in "good faith."

be beyond the debtor's ability to pay as such debts matured. (emphasis added).

One of the elements required for avoidance under section 548(a)(2) is that the debtor receive less than a reasonably equivalent value in exchange for the transfer. We must therefore determine whether the services appellants provided and the payments they received were reasonably equivalent in value. This is an unusual question which has not been addressed in a reported decision in nearly 60 years.

Appellants argue that the bankruptcy court erred when it ruled as a matter of law that the services they rendered in exchange for the commission payments "were without legally cognizable value." "Value" within the meaning of section 548 includes the "satisfaction ... of ... [an] antedecent debt of the debtor...." 11 U.S.C. § 548(d)(2)(A). Appellants argue that the commission payments they received were in satisfaction of antecedent debts as that term is used in section 548. They contend that the debtors incurred those antecedent debts as a result of the services appellants performed pursuant to their contracts with the debtors. Appellants also argue that a determination of whether a transferee has given a reasonably equivalent value to a debtor should embody two distinct determinations. The first issue to be determined is whether the transferee gave any value at all and, if so, the second issue to be determined is whether the value given was reasonably equivalent to the value of the property transferred. They ask us to hold that, as a matter of law, they gave value and to remand these cases for a factual determination as to whether the value given was reasonably equivalent to the amounts they received.

The trustee argues, on the other hand, that the finding of the bankruptcy court with regard to the value of appellants' services constitutes a question of fact which can only be reversed if clearly erroneous and maintains that the finding of the bankruptcy court was not erroneous. He points out that the assets of the estate are insufficient to allow all the defrauded parties complete recovery and reasons that the defrauded investors should recover as against the sales agents. The trustee contends that appellants' services do not fall within the definition of "value" as used in section 548. He analogizes to nonbankruptcy cases in which brokers, ignorant of the fraud involved, have been denied commission payments or brokerage fees. He maintains that the approach taken in *In re Ponzi*, 15 F.2d 113 (D.Mass.1926), and followed by the bankruptcy court in this case, is sound and should be affirmed by this court.

■ The determination made by the bankruptcy court regarding the value of appellants' services was not a finding of fact as asserted by the trustee. It is true that a finding of less than a reasonably equivalent value is a finding of fact that can be reversed only if clearly erroneous. *In re Roco Corp.*, 21 B.R. 429, 433 (1st Cir.1982). In this case, however, the bankruptcy court did not make such a finding. Rather, it held as a matter of law that because the appellants' services deepened the debtors' insolvency and furthered a fraudulent scheme, the services were "without legally cognizable value." Such a conclusion of law is subject to de novo review in this court.

■ We agree with appellants that the issue of reasonably equivalent value presents two questions. First, did the transferee give value? Second, if the transferee did give value was the value given reasonably equivalent to the value of the transferred property? We also agree with the appellants that, as a matter of law, the services they performed for the debtors constitute "value" and we therefore remand these cases to the bankruptcy court for a determination of whether the services appellants performed for the debtors were reasonably equivalent in value to the payments appellants received.

■ Under the present Bankruptcy Code, satisfaction of a present or antecedent debt constitutes value. *See* 11 U.S.C. § 548(d)(2)(A). In these cases, the

debtors contracted with appellants for the sale of undertaker contracts. Pursuant to their contracts, appellants performed services thereby giving consideration to the debtors under the terms of their contracts. Accordingly, the debtors incurred the obligation to pay appellants for their services. That obligation constituted a debt that was satisfied by the payment of commissions pursuant to the contracts. The satisfaction of the debts to appellants falls squarely within the definition of value found in 11 U.S.C. § 548(d)(2)(A).

The bankruptcy court reasoned that appellants gave no value because the services that they performed were actually detrimental in that each contract they sold increased the debtors' insolvency. The fact that the services appellants performed increased the debtors' insolvency does not preclude a determination that the appellants gave value. By definition, a Ponzi scheme is driven further into insolvency with each transaction. Therefore, by the trustee's reasoning, no one who in any way dealt with, worked for, or provided services to the debtors could prevent avoidance of any transfers they received. The debtors' landlord, salaried employees, accountants and attorneys, and utility companies that provided services to the debtors all assisted the debtors in the furtherance of their fraudulent scheme. In spite of this fact, we do not think that the goods and services that these persons and entities provided were without value or that transfers to them could be set aside as fraudulent conveyances. We see no material distinction between such persons or entities and appellants.[10] All were necessary to the success of the debtors' scheme.[11]

The financial position of a debtor need not necessarily be improved by a particular transaction in order for us to hold that value was given. For example, if an employee or officer of a legitimate company made a bad business decision which actually worsened the financial position of that company, we do not believe that the salary paid to that officer or employee could be set aside as a fraudulent conveyance. Similarly, the compensation of an attorney who is retained on an hourly basis is not contingent on him winning a case or otherwise improving his client's position.

In rejecting the approach we adopt in this opinion, the bankruptcy court relied exclusively on the opinion of the district court of Massachusetts in *In re Ponzi*, 15 F.2d 113 (D.Mass.1926). *Ponzi* involved a scheme similar to the scheme in this case in which investors were paid returns from the principal sums invested by other investors. One of Charles Ponzi's sales agents had invested his commissions in Ponzi's notes, not knowing that the scheme was a fraud. After Ponzi was adjudged a bankrupt, the agent sought allowance of his claim. The court reasoned that if the supposed consideration which passed from the transferees to the debtor was not in fact valuable, the payments could be avoided. Holding that the services the agent rendered were actually detrimental because they deepened Ponzi's insolvency, the court disallowed the agent's claim.

*Ponzi* is distinguishable from the case at bar in that it was decided under the Bank-

---

10. It may be argued that the landlord and utility companies gave tangible property in exchange for the transfers they received and that appellants gave nothing tangible. Such an argument is not supported by the bankruptcy court's findings of fact. Finding number 9 was that "the sales agents incurred out-of-pocket expenses for which they were not reimbursed by the debtors." Thus, we conclude that the appellants are entitled to recover at least to the extent of the amount they advanced in connection with their sales activities. The value of their time and services is a factual question to be resolved by the bankruptcy court.

11. In the same way, the investors, whose cause the trustee advocates, were also essential to the success of the debtors' Ponzi scheme. We do not understand why those who invested in the scheme expecting annual returns of over 95% on their investments are necessarily more "innocent" or deserving of recovery than are appellants. All were victims of the clearinghouse scheme. If the commissions received by the salesmen were exorbitant in relation to the services rendered, that discrepancy will be resolved on remand when the bankruptcy court determines whether the value of the services was reasonably equivalent to the transfers made.

ruptcy Act of 1898 which did not define "satisfaction of a present or antecedent debt" as constituting value. The question presented in *Ponzi* was rather whether the debtor recovered a present, fair, consideration in exchange for the transfer. 15 F.2d at 114. *See also* Bankruptcy Act of 1898 § 67, Appx. 1 *Collier on Bankruptcy* pp. 83–91 (L. King 15th ed. 1985). Under the present Code, the relevant issue is whether appellants gave value to the debtor. Because value includes "satisfaction of a present or antecedent debt," 11 U.S.C. § 548(d)(2)(A), the issue of whether the sale of undertaker contracts actually benefitted the debtors is irrelevant. *Cf. Bloor v. Dansker (In re Investors Funding Corp.)*, 523 F.Supp. 533, 549 (S.D.N.Y.1980) (concept of fraudulent transfer does not embrace an inquiry into quality of services). So long as the debtors' payment of commissions to appellants satisfied a present or antecedent debt, the payments are not avoidable pursuant to section 548(a)(2).

The nonbankruptcy cases cited by the trustee, in which innocent brokers were denied commissions in fraudulent transactions, are distinguishable from the case at bar. For example, *Houston v. Brittingham*, 125 N.J.L. 296, 15 A.2d 657 (1940); *K. Lundeen Corp. v. Barlow*, 120 Cal.App. 391, 7 P.2d 1102 (Dist.Ct.App.1932); *Wright v. Buzzine*, 180 Cal.App.2d 426, 4 Cal.Rptr. 482 (Dist.Ct.App.1960), and *Campbell v. Hood*, 35 S.W.2d 93 (Tex. Comm'n App.1931), all held that a broker does not earn his commission when a buyer uses fraud to induce a seller to enter into a transaction. The underlying reasoning behind such decisions is that a broker is not entitled to a commission when he fails to accomplish what he was employed to do— procure a customer who was willing to enter the transaction in good faith and for fair value. In this case, however, appellants entered into a contract with the debtors and performed as requested by them. As a result, appellants had a valid contrac-

tual claim against the debtors. The payment of such a claim constitutes value as defined in section 548(c).

Nonbankruptcy cases holding that an innocent broker is not entitled to his commission in a fraudulent transaction are distinguishable from the case at bar for another reason. Such cases have denied recovery of commissions as against an innocent party, not as against a fraudulent principal. The trustee has cited no case in which it has been held that a broker has no cause of action against his fraudulent principal. In this case, the principals declared bankruptcy. Inasmuch as appellants were entitled to the commissions as against the debtors, they are entitled to them as against the bankrupt estate to the extent allowed by the Code.

■ We conclude that a determination of whether value was given under section 548 should focus on the value of the goods and services provided rather than on the impact that the goods and services had on the bankrupt enterprise. We therefore hold that, as a matter of law, the services provided by appellants did constitute value as that term is used in section 548. We remand these cases to the bankruptcy court for factual findings on the issue of whether the value of the services provided by appellants was reasonably equivalent to the value of the transfers received.

### Illegally Seized Evidence

Our decision to remand these cases for further factual findings obviates the need to rule on appellants' remaining arguments.[12] Two of the remaining issues, however, will undoubtedly be raised again on remand and thus merit discussion.

The first of these issues involves the *pro se* appellants' claim that their constitutional rights were violated by the use of evidence which was obtained through searches viola-

---

**12.** For example, in light of our reversal of the bankruptcy court's ruling, it is unnecessary to

address appellants' contention that they did not

tive of the fourth amendment.[13] The searches at issue took place pursuant to a warrant issued by a United States magistrate on the basis of an affidavit filed by FBI Special Agent Loren C. Brooks who was investigating the clearinghouse companies. The warrant was later held to be invalid by District Judge Aldon J. Anderson on a motion to suppress filed in criminal proceedings against the principals of the clearinghouses.

Appellants argue that use of the illegally seized evidence violates the due process rights guaranteed them by the fifth and tenth amendments. They do not, however, explain the impact of such an argument on this case. We hold that appellants' argument is without merit and that, in any event, appellants have no standing to raise such a claim.

The evidence in question was not improperly seized. Since appellants' brief was filed, the Tenth Circuit Court of Appeals has reversed Judge Anderson's holding and has held that the fourth amendment rights of the criminal defendants in that proceeding were not violated. *United States v. Cardall*, 773 F.2d 1128 (10th Cir.1985).[14] Given the Tenth Circuit's holding, we find no merit in appellants' claim of fourth amendment violations.

■■■ Had appellants been able to demonstrate that a fourth amendment violation had occurred, their argument would not be well taken because they have not demonstrated the "expectation of privacy" necessary for standing to challenge the legality of the searches involved. In *Rakas v. Illinois*, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978), the Supreme Court held that in order to challenge the legality of a search or seizure, a person must show that he had a "legitimate expectation of privacy in the invaded place." *Id.* at 143; 99 S.Ct. at 430. *See also, United States v. Payner*, 447 U.S. 727, 731, 100 S.Ct. 2439, 2444, 65 L.Ed.2d 468 (1980). There has been no showing, and we believe appellants would be hard pressed to demonstrate, that they had any expectation of privacy in either the business offices of the clearinghouses or in the business records seized. *See Rawlings v. Kentucky*, 448 U.S. 98, 105, 100 S.Ct. 2556, 2561, 65 L.Ed.2d 633 (1980); *United States v. Salvucci*, 448 U.S. 83, 90, 100 S.Ct. 2547, 2552, 65 L.Ed.2d 619 (1980).

Because the evidence at issue was seized legally and because appellants have no standing to challenge the legality of the searches, we hold that appellants are precluded from raising this issue again on remand.

*Prejudgment Interest*

Appellants also contend that the bankruptcy court abused its discretion in granting prejudgment interest to the trustee. Although they acknowledge that the court has broad discretion in determining when prejudgment interest should be granted to the prevailing party, they argue that the court's failure to consider the merit of their defenses constitutes error because such consideration was essential to the proper exercise of the court's discretion. However, appellants cite no authority for their argument, and we find it to be without merit.

If we are to find that the bankruptcy court abused its discretion, we "must have a definite conviction that the court, upon weighing relevant factors, clearly erred in

receive notice of the hearing on the trustee's motion for summary judgment.

**13.** The searches at issue were of the business offices of the clearinghouses; 986 Atherton Drive, Suite 101, 201 and 212, 1020 Atherton Drive, Suites 101A and 101B and 5066 West Amelia Earhart Drive. The items seized consisted of the business records of the clearinghouses.

**14.** The Court of Appeals reversed Judge Anderson's holding on two grounds. It first reasoned that "[j]udged in the light of the common sense

review mandated by *[Illinois v.] Gates,* [462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983) ], ... the affidavit was sufficient to show probable cause" and the search was valid. *Cardall,* 773 F.2d at 1132. The Court of Appeals further reasoned that even had the affidavit been insufficient to support a finding of probable cause, the evidence should not have been suppressed on account of the good faith exception to the exclusionary rule established in *United States v. Leon,* 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984). *Id.*

its judgment." *Gordon v. United States Steel Corp.*, 724 F.2d 106, 108 (10th Cir. 1983) (citing *Hummell v. S.E. Rykoff & Co.*, 634 F.2d 446, 452 (9th Cir.1980); *Pue v. Sillas*, 632 F.2d 74, 78 (9th Cir.1980)). Thus, appellants can prevail only if we find that the bankruptcy court "clearly erred in its judgment" by failing to give any weight at all to a factor crucial to the exercise of its discretion.

State law governs awards of prejudgment interest in bankruptcy proceedings. *In re Stevens*, Bankruptcy Case No. 82C–01201, slip op. at 5–6 (Bankr.D. Utah June 30, 1983) (citing *In re Wilson*, 12 B.R. 363, 370 (Bankr.M.D.Tenn.1981); *In re Spector*, 22 B.R. 226, 234 (Bankr.N.D.N.Y. 1982)). Therefore, we must turn to the law of Utah for guidance in determining what factors are relevant to a prejudgment interest award.[15] Under Utah law, the rationale for awarding prejudgment interest to the prevailing party is not to penalize the other party for some lack of merit in its case but is, rather, to make the prevailing party whole. *See First Security Bank of Utah, N.A. v. J.B.J. Feedyards, Inc.*, 653 P.2d 591, 599–600 (Utah 1982); *Uinta Pipeline Corp. v. White Superior Co.*, 546 P.2d 885, 887 (Utah 1976); *Fell v. Union Pacific Railway Co.*, 32 Utah 101, 88 P. 1003, 1005–07 (1907). These cases require only that the amount of damages be certain at the date from which interest is granted. *See First Security Bank*, 653 P.2d at 600 (citing *Bjork v. April Industries, Inc.*, 560 P.2d 315 (Utah 1977), *cert. denied*, 431 U.S. 930, 97 S.Ct. 2634, 53 L.Ed.2d 245 (1977)); *Uinta Pipeline*, 546 P.2d at 887; *Fell*, 88 P. at 1006–07. Thus, under Utah law, the relative merit of appellants' case is entirely irrelevant to an award of prejudgment interest. We cannot find that the bankruptcy court, in ignoring an irrelevant factor, abused its discretion.

A finding of abuse of discretion is precluded not only by Utah law, but also by bankruptcy law. "It is well settled that in an action to set aside a preference the trustee is entitled to prejudgment interest from the date of demand for its return, or, in the absence of a prior demand, from the date of commencement of the adversary proceeding." *Merrill*, 41 B.R. at 1015 (citations omitted); *see generally* 4 Collier on Bankruptcy ¶ 550.02, at 550–6 to –7 (15th ed. 1984); 3 Collier on Bankruptcy ¶ 60.-63[1], at 1129 (14th ed. 1977); Annot., 4 A.L.R.2d 327 (1949)). The rationale for this rule applies not only to voidable preferences, but also to conveyances that are fraudulent under Section 548(a)(2). 41 B.R. at 1016.[16]

For the reasons stated above, the bankruptcy court did not abuse its discretion in awarding prejudgment interest from the date of commencement of the suit. Therefore, if the trustee is successful in obtaining judgments against appellants on remand, it is within the sound discretion of the bankruptcy court to award prejudgment interest on the judgments obtained.

Accordingly, we hold that the bankruptcy court erred in ruling that, as a matter of law, the services appellants rendered had no legally cognizable value. We hold that such services do have some value as that term is used in 11 U.S.C. § 548(a)(2) and remand these cases to the bankruptcy court for a factual determination on the issue of whether the value appellants gave was reasonably equivalent to the value of the transfers they received from the debtors.

---

15. *See supra* note 8.

16. In *Robinson v. Watts Detective Agency, Inc.*, 685 F.2d 729, 741–42 (1st Cir.1982), *cert. denied*, 459 U.S. 1105, 103 S.Ct. 728, 74 L.Ed.2d 953, 459 U.S. 1204, 103 S.Ct. 1191, 75 L.Ed.2d 436 (1983), the First Circuit approved the rule that prejudgment interest should be awarded from the date of commencement of the action, but declined to award interest in a proceeding to recover a fraudulent conveyance under former 11 U.S.C. § 107(d)(2), the predecessor of Section 548(a)(2), only because the property conveyed did not have a definite and ascertainable value.